651 A.2d 204

**MAJOR MANUFACTURING CORPORATION, Petitioner,**

v.

**DEPARTMENT OF REVENUE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 23, 1994.

Decided Nov. 29, 1994.

Reargument Denied Jan. 13, 1995.

C. Grainger Bowman, for petitioner.

Lora A. Kulick, for respondent.

Before DOYLE and FRIEDMAN, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

Pursuant to Section 2 of the Local Option Small Games of Chance Act (Act),[1] the General Assembly declared as its legislative intent that "the playing of small games of chance for the purpose of raising funds, by certain nonprofit associations, for the promotion of charitable or civic purposes, is in the public interest." To that end, it provided that "[e]very eligible organization to which a license has been issued under the provisions of this act may conduct games of chance for the purpose of raising funds for public interest purposes." 10 P.S. § 314.

The General Assembly defined "Games of Chance" as follows:

Punchboards, daily drawings, raffles and pull-tabs, as defined in this act, *provided that no such game shall be played by or with the assistance of any mechanical or electrical devices or media other than a dispensing machine or passive selection device* and further provided that the particular chance taken by any person in any such game shall not be made contingent upon any other occurrence or the winning of any other contest, but shall be determined solely at the discretion of the purchaser. This definition shall not be construed to authorize any other form of gambling

1. Act of December 19, 1988, P.L. 1262, *as amended*, 10 P.S. § 312.

currently prohibited under Title 18 of the Pennsylvania Consolidated Statutes (relating to crimes and offenses). Nothing in this act shall be construed to authorize games commonly known as 'slot machines' or 'video poker.'

10 P.S. § 313 (emphasis added).

At issue in this case is a proposed "pull-tab" game with certain nontraditional features. A "pull-tab" is defined as follows:

A single folded or banded ticket or strip ticket or card with a face covered to conceal one or more numbers or symbols, where one or more of each set of tickets or cards has been designated in advance as a winner.

10 P.S. § 313.

Here, Major Manufacturing Corporation (Major) petitions for review of the Secretary of the Department of Revenue's September 24, 1993 approval of the Small Games of Chance Board's (Board's) recommended denial of Major's request to market its proposed pull-tab small game of chance, the "Lucky Tab Pull Dispenser Model 1010–BV device" (the device). The primary issue before us is whether the Secretary erred in concluding that the video display component of the device assists in the "play" of the pull-tab game by mechanical or electrical devices such that it is "other than a dispensing machine" and is therefore a prohibited device which electronically substitutes for the playing of the game in violation of Section 3 of the Act, 10 P.S. § 313. Because we find that the Secretary did not abuse her discretion and made no error of law in concluding that the components of the device assist in the play of the game, we affirm.

On September 15, 1992, Major filed an application for registration as a small games of chance manufacturer with the Department. (R.R. 31a.) In Schedule "D" of the application, Major listed "Lucky Tab Model *1010–B*" (1010–B), a predecessor of the 1010–BV device at issue here, as a small game of chance to be distributed in the Commonwealth. (R.R. 40a.) The Department approved Major's 1010–B application on January 14, 1993 and listed Major as a manufacturer of small

games of chance under registration No. M/S–0034. (R.R. 31a.)

The predecessor 1010–B model, which was approved, can be described as follows:

> The paper pull tabs game is played with a box of pre-printed cards or tickets. Each box has a specified number of winning cards with prizes in different amounts. The number and amount of the prizes in each pre-printed game is displayed to the customer by means of a display called a flare card. The flare card is like a 'master' card with a list of predetermined winning combinations. Each new batch of pull tab cards is dumped into a dispenser to be mixed up so they will be distributed randomly. When a player pur-chases a card they peel back the paper strips to see if they match the flare card for that game. If they match, the player takes their [sic] ticket to the cashier to exchange it for their [sic] prize.

> With 'Lucky Tab' model 1010–B, the game of paper pull tabs has been technologically advanced to out perform all other pull tab dispensers. The 'Lucky Tab' machine is housed in a floor-standing cabinet and has the current flare card displayed on the front glass.

> . . . .

> [The 'Lucky Tab' model 1010–B] is very similar to all other dispensers in that you insert money into the bill acceptor to purchase pull tabs. Next you select the 'NEXT TAB' button on the control panel, engaging the next tab to be dispensed. You then select the 'PULL' button which will dispense the pull tab.

> . . . 'Lucky Tab' tabs are pre-printed and glued together just like regular pull tabs except they come in one long roll.

(R.R. 41–43a.)

In a May 15, 1993 letter, Major requested permission to market its proposed 1010–BV device under its current license, M/S–0034. (R.R. 33a, 44a.) The more technologically ad-vanced pull-tab 1010–BV device can be described as follows:

It is similar to all other dispensers in that you insert money into the bill acceptor ... to purchase pull tabs. Next you select the 'NEXT TAB' button on the control panel, engaging the next tab to be dispensed. You then select the 'PULL' button which will dispense the pull tab. The machine also has a [video] display button that will allow the player to display his ticket....

(R.R. 22a.)

Unlike the 1010–B model, however, the more highly advanced 1010–BV device has a bar code scanner which scans the exact contents of the pull-tab ticket and then causes the image on the ticket to be displayed on video. (R.R. 82a) The scanner "is the interpreting network for the [video] display." (R.R. 82a.) The display element of the device consists of a picture tube "that displays the image that's on the ticket." (R.R. 84a.) After the player inserts a dollar bill, the device's lights illuminate and the player has the option of next tab and pull. (R.R. 85a.) When the player is a winner, the top light illuminates. (R.R. 98a.) In addition, after the video display, the device emits a musical jingle from which the player can determine whether he is a winner or a loser. (R.R. 97a.) Therefore, on the basis of either the video display, lights or music, the player knows whether he is a winner or loser without ever having to open the pull-tab.

On July 22, 1993, the Department of Revenue (Department) issued a determination that Major's new device violated Section 3 of the Act because "the device contains a video display which assists in the play of pull tabs in violation of the definition of Games of Chance." (Board's decision at 1.) Major petitioned for review of that determination and the Board held a hearing on September 9, 1993 where it considered the specific issue of whether the device's video display screen assisted in the "play" of this small game of chance.

Major asserted before the Board that there are three elements of "play" to a game of chance: consideration, chance

and reward,[2] and that its device does not assist in the "play" of the game. It argued that the device's video monitor does not assist in the play of the game because the game is played at the time a winning ticket is redeemed. It also argued that its device is statutorily exempted from the prohibition of mechanical or electrical devices which assist in play because it is merely a pull-tab dispensing machine, similar to the 1010–B device which had previously been approved by the Board.

The Board determined that the play of the game takes place at the time of the purchase of the ticket, and not as Major argues, at the point of payoff. The Board also reasoned that, due to the video display screen as well as the music and lights, which are programmed to reveal to the player whether the ticket is a winner or loser, the act of play could be perceived as being assisted by mechanical or electrical devices.

The Board further concluded that the device cannot be construed as an authorized dispensing device because the device not only dispenses a ticket, but the game of chance can be played without a ticket until the payoff. Thus, the device is not exempted from the prohibition of mechanical or electrical devices which assist in play.

The Secretary of the Department approved the Board's decision to deny Major's request to market its device and Major petitioned for review of that decision with our Court.

## ISSUES

There are four issues before us for review: 1) whether the Secretary erred in determining that the device's video display assists in the play of the pull-tab game in violation of Section 3 of the Act, 10 P.S. § 313; 2) whether the Secretary erred in refusing to rule that the device is exempted from the prohibition of using mechanical or electrical devices to assist in the play of the game; 3) whether Major was given proper notice of the basis for denial before the hearing convened; and 4) whether Major's procedural argument that the Department

2. *Commonwealth v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973 (1983).

failed to act on its application to market the device within sixty days under 61 Pa.Code § 901.118 was properly considered.

## DISCUSSION

### 1. Video Display and Play of Game:

■ Major argues that the Board should have considered whether the three elements of a game of chance (consideration, chance and reward) are assisted by the device's video display. Major contends that the element of consideration, the price paid for each pull-tab ticket, is not assisted by the video display monitor because nothing in the device permits the player to manipulate the price paid for each ticket.

Major argues that the element of chance, the random odds of winning each game, is not assisted by the video display because the element of chance is predetermined by the random distribution of winning pull-tab tickets within the pull-tab rolls. The pull-tab tickets can only be dispensed in a determined order and nothing in the device enables a player to manipulate or alter the order in which the tickets are dispensed.

As for the reward element, paying a value to a winning player, Major argues that the reward is not assisted by the video display because the player cannot utilize the video display or any part of the device to manipulate or alter the amount of the reward. Further, each winning player must present the winning ticket to a cashier for payment.

The Department argues that the test is not whether the three elements of a game of chance are assisted, but whether the game is played by or with the assistance of mechanical or electrical devices. (R.R. 111a.) We agree and find Major's argument in that regard to be without merit.

■ The Department further contends that its determination that Major's device is "played" when the player purchases the ticket should rule. It points out that neither the cases nor the Act describe the time of "play" of either a pull-tab ticket

or a small game of chance. In addition, it cites Section 2 of the Act, which, in pertinent part, provides as follows:

It is hereby declared to be the policy of the General Assembly that all phases of licensing, operation and regulation of small games of chance be strictly controlled, and that *all laws and regulations with respect thereto as well as all gambling laws should be strictly construed and rigidly enforced.*

10 P.S. § 312 (emphasis added). Therefore, the Department argues that, since there is no specific legislative direction in determining when a game is considered to be "played," its narrow interpretation as the agency given enforcement responsibility should be given deference. *See Mormak v. Unemployment Compensation Board of Review,* 135 Pa.Commonwealth Ct. 232, 579 A.2d 1383 (1990).

In addition, the Department contends that, construing the meaning of "play" based upon its common usage,[3] Major's interpretation would lead to an absurd result. In other games, such as the Pennsylvania Lottery, it is clear that a person is considered to have played when he purchases the pull-tab ticket, not merely if he is lucky enough to reach the point of payoff. According to the Department, the slogan "you have to play to win" says it all. You also have to "play" to lose, which is why these games are called games of *chance.*

In our view, however, this metaphysical discussion as to the precise timing of the "play" misses the point. Major's witness admitted at the hearing that the video screen and lights did in fact enhance the play of the game.

The following passages in the record support the proposition that the device is "played by or with the assistance of any mechanical or electrical devices:"

[Mr. Bowman, Counsel for Major]

Q. Now the lights—buttons are light up *for purposes of play.* Is that correct?

[Mr. Ronald Clapper, Major representative]

3. 1 Pa.C.S. § 1903(a).

A. Right. (R.R. 87–88a) (emphasis added).

. . . .

[Mr. Paul S. Roeder, Board Member]

Q. [M]y question is, what is the advantage to the manufacturer to have the video screen?

[Mr. Clapper]

A. Play appeal. It *enhances the play.* (R.R. 100–101a) (emphasis added).

After reviewing the record, we agree with the Board that the nontraditional components of the device, at the very least, assist the play of the game, if not actually substitute for the play of the game.

### 2. Alleged Exemption of the Device as a Mere Dispensing Machine:

■ Major argues that its device is exempt under Section 3 of the Act because the General Assembly therein only prohibits the play of the game "by or with the assistance of any mechanical or electrical devices or other media *other than a dispensing machine* or passive selection device. . . ." Thus, Major contends that its device is merely a dispensing machine, which is defined as "[a] device designed exclusively for the dispensing of the games of chance authorized by this act, including . . . stamp machines." 10 P.S. § 313.

The Department argues that the reference in the Act to "other than a dispensing device" refers only to passive dispensing devices as exceptions that may assist the play of a pull-tab game. It asserts that, by definition, a dispensing machine is a device which *exclusively* acts to dispense tickets.

The Department contends that Major's device is an active machine and not a mere facilitator of ticket dispensing because it permits the player to watch the game being played, know that he has a winning ticket prior to opening the ticket and in fact, only use the ticket as a receipt for redemption. In other words, a player may rely on the video display and discard the losing ticket without ever opening it. In addition, also without

opening the ticket, a player may alternatively rely on the device's electronic sound or its lights in determining whether he is a winner.

Based on the active nature of the device and the General Assembly's directive in Section 2 of the Act to strictly construe "all phases of licensing, operation and regulation of small games of chance," [4] we conclude that Major's 1010–BV device clearly is not a mere dispensing device as contemplated under Section 3 of the Act, 10 P.S. § 313.

### 3. Notice for Basis of Denial:

■ Major argues that the Board erred by considering the programmable option of music and lights as a primary basis for denial without prior notice to Major. Major asserts that the Department's July 22, 1993 letter of denial listed the video display as the *only* basis for denial, but that the Board based its decision, in part, on the music and lights as well. Thus, Major argues that the Department's lack of notice as to the music and lights deprived Major of an opportunity to address that issue during the hearing. It notes that administrative agencies must give adequate notice calculated to apprise the parties of the pendency of the action and give them an opportunity to present their objection. *Clark v. Department of Public Welfare,* 58 Pa.Commonwealth Ct. 142, 427 A.2d 712 (1981).

The Department contends that, although the music and lights were additional factors, they were not the basis for denial of Major's request to market the device. It asserts that Major was on notice that distribution of its device was not authorized due to the mechanical assistance of play by the device. There were no hidden results or alternatives; the question of whether the machine would be legal if it operated with just lights and music was not raised and not an issue to be decided. We agree.

4. 10 P.S. § 312.

## 4. Sixty–Day Period in Which to Consider Applications:

■ The Department admits that it did not consider Major's request to market the device in a timely manner. (R.R. 109a.) Specifically, the parties made the following stipulations with regard to the Department's actions concerning its review of the device:

7. From February 20, 1993 until May 6, 1993, no action was taken by the Department to approve or disprove the Model 1010–BV.

. . . .

10. From May 19, 1993 until July 22, 1993, the Department took no action to approve or disapprove the Model 1010–BV.

(R.R. 32–3a.)

There is a dispute, however, as to the effect of the Department not acting on Major's request within sixty days. The sixty-day provision in the applicable regulations provides as follows:

### § 901.118. Registration decision time limit.

The Department will approve or deny applications within 60 days of their receipt unless the applicant is notified in writing of the specific reason for delay. . . .

61 Pa.Code § 901.118.

Major argued before the Board that the Department's failure to approve or disapprove its application to market the device within sixty days pursuant to 61 Pa.Code § 901.118 divested the Department of authority to deny the application. (R.R. 5a.) Impliedly, therefore, Major contended that there should be a "deemed approval" of its request to market the device. There is, however, no "deemed approval" provision in either the Act or the regulations promulgated thereto. In the absence of any such provision, we decline to legislate one into existence.

In addition, as evidenced by the title of the regulation, "Registration decision time limit," it describes the decision

time limit for reviewing applications for registration as manufacturers, not applications or requests to market devices. In fairness to Major, we note that a required content of the registration application is "[a] complete list or catalogue of all small games of chance to be manufactured." Also, we can find no provision in the regulations for either amending the registration application or for making an application to market a device not included in the original registration application. That does not mean, however, that the sixty-day provision automatically applies to mere requests to market devices. Therefore, in the absence of legislative direction, we must conclude that Major's argument about the mandatory sixty days simply does not apply to its request to market the new 1010–BV device.

By our decision, we in no way condone the length of time taken by the Department to consider Major's request; we simply find that Major's reliance on the sixty-day provision precludes our consideration of any issue involving the proper time period in which the Department must act on requests to market devices.

## CONCLUSION

Accordingly, because the record supports the finding that the 1010–BV is played by or with the assistance of the video display component, music and lights, we affirm the Secretary of Revenue's order denying Major's request to market its "Lucky Tab Pull Dispenser Model 1010–BV device."

## *ORDER*

**AND NOW,** this 29th day of November, 1994, the order of the Secretary of Revenue dated September 24, 1993 denying Major's request to market its "Lucky Tab Pull Dispenser Model 1010–BV device" is hereby affirmed.

FRIEDMAN, Judge, dissenting.

I vigorously dissent. I believe that Major Manufacturing Corporation's (Major) Lucky Tab Pull Tab Dispenser Model

1010–BV (Model 1010–BV) does not violate section 3 of the Local Option Small Games of Chance Act (Act) [1] by "playing" or assisting in the "play" of the pull-tab game. Moreover, the Model 1010–BV is nothing more than a dispensing machine and, as such, is expressly exempted from the prohibition against mechanical and electrical devices in section 3. Thus, I would reverse the order of the Secretary of Revenue, who accepted the recommendation of the Small Games of Chance Board and sustained the Department of Revenue's (Department) denial of Major's request for authorization to market the Model 1010–BV.

## I. "Played by or with the assistance of"

The Majority concludes that "the nontraditional components of the device, [i.e., video, lights and sound,] at the very least, assist the play of the game, if not actually substitute for the play of the game." (Majority Op. at 586.) However, the Majority offers little, if any, support for this conclusion. After the Majority rejects without reason Major's contention that the "play" of the game consists of consideration, chance and reward, the three elements of *any* small game of chance, the Majority also dismisses the Department's argument that "play" occurs when the player purchases a ticket.[2] (Majority Op. at 207.)

1. Section 3 of the Local Option Small Games of Chance Act (Act), Act of December 19, 1988, P.L. 1262, 10 P.S. § 313 (emphasis added), states in pertinent part:

   "**Games of chance.**" Punchboards, daily drawings, raffles and pull-tabs, as defined in this act, provided that *no such game shall be played by or with the assistance of any mechanical or electrical devices or media other than a dispensing machine or passive selection device....*

2. In support of its argument, the Department notes that the Act should be strictly construed, *see* section 2 of the Act, 10 P.S. § 312, and that deference should be given to the Department's interpretation of the statute when there is no specific legislative direction. However, the rule properly stated is that "an administrative agency's expert interpretation of a statute for which it has enforcement responsibility is entitled to great deference and will not be reversed *unless clearly erroneous.*" *Mormak v. Unemployment Compensation Board of Review,* 135 Pa.Commonwealth Ct. 232, 237, 579 A.2d 1383, 1385–86 (1990) (emphasis added).

Indeed, the Majority never offers a definition of the statutory term at issue here, i.e., "play." Instead, the Majority shifts the focus of the inquiry by relying upon Major's testimony that the video screen "enhances the play" of the game. (Majority Op. at 586.) In so doing, a new issue of statutory construction emerges: whether "enhance" means to "assist." Unfortunately, the Majority also fails to address this question.[3]

In this case, the Department's interpretation of the Act is clearly erroneous. A person who purchases a ticket may never "play" that ticket. Indeed, the purchaser of a ticket might give the ticket to a friend or relative as a gift. Or, the purchaser might lose the ticket and never actually "play" the game. Or, the purchaser may have been given money by a co-worker to purchase a ticket, in which case the purchaser is not even the "player." Thus, to accept the Department's argument that the game is "played" when the ticket is purchased would lead to absurd results.

Moreover, although the Department asserts that it has adopted the common and approved usage of the term "play" in reaching its position, instead of offering an approved dictionary definition of the word, the Department relies upon an advertising expression utilized to promote the Pennsylvania Lottery: "you have to play to win." However, I do not believe that this court should determine the meaning of a statutory term based upon its use in the advertising community, where the meanings of words change by the hour.

Furthermore, the Department states that the *device* is "played" when the player purchases a ticket. However, the statute specifically refers to the "play" of the *game*, not the device. *See* section 3 of the Act, 10 P.S. § 313. The Department thus implies that the Model 1010–BV is a "gambling device;" however, the Model 1010–BV is not a "gambling device" because the operation of its mechanical and electrical components does not determine whether a ticket is a winner. *See In re: One 1986 Oldsmobile Sedan,* 165 Pa.Commonwealth Ct. 61, 644 A.2d 240 (1994).

3. In the context of Major's testimony, the word "enhance" means to "advance." *See* Webster's Third New International Dictionary 753 (1966). Indeed, Major testified that the video monitor does nothing more than enhance the old paper game of pull-tab by bringing it into the twentieth century. (R.R. at 70a–71a.) Accordingly, "[t]he video screen is marketing" for a new generation of pull-tab players. (R.R. at 99a.)

The word "assist," on the other hand, means to "help." Webster's Third New International Dictionary 132 (1966). It is true that the video monitor may "help" visually impaired people read the face of the pull-tab ticket. The monitor may also "help" any player discover whether the dispensed ticket is a winner. However, in either event, the statute does *not* prohibit the device from helping the *player;* rather, section 3 states that the device may not help the "play" of the game.

I believe that a proper analysis of the statutory language supports Major's position that the "play" of a pull-tab game consists of the three elements of gambling: consideration, chance and reward. Indeed, following section 1903(a) of the Statutory Construction Act of 1972,[4] the common and approved usage of the word "play," at least in the context of a statute regulating small games of chance, is "gambling." Webster's Third New International Dictionary 1736 (1966). Pennsylvania courts have long recognized the technical legal definition for "gambling" that Major presents in support of its position, and this court would be remiss to ignore its applicability here. *See Commonwealth v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973 (1983).

Accordingly, because the amount paid to play the pull-tab game (consideration), the chance of winning (element of chance) and the amount won (reward) are not influenced at all by the video monitor, I would conclude with Major that the Model 1010–BV does not "play" or assist in "playing" the pull-tab game.[5]

> Unfortunately, as stated above, the Majority fails to define the statutory term "play."

4. Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a), states in pertinent part:

> Words ... shall be construed ... according to their common and approved usage; but technical words ... shall be construed according to ... [their] peculiar and appropriate meaning or definition.

5. I also note that the Model 1010–B, which the Department previously approved, contains a light that flashes and sounds that play when the machine dispenses a winning ticket. (R.R. at 97a–98a, 117a–18a.) In each case, the player knows whether the ticket is a winner before the player pulls the tab. The Majority does not explain why the Model 1010–B, which is still a permissible machine, does *not* "play" or assist in the "play" of the pull-tab game by giving away the outcome with lights and sounds, but Model 1010–BV "plays" or assists in the "play" of the pull-tab game by revealing the result via video monitor. My view is that the device can signal a winning ticket by flashing lights, by playing music, or by bringing out dancing girls but, as long as these features do not affect the consideration, chance and reward of the pull-tab game, they do not assist in its "play."

## II. "Dispensing Machine"

The Majority next determines that the Model 1010–BV "clearly is not a mere dispensing device as contemplated under Section 3 of the Act, 10 P.S. § 313," based on the active nature of the device and the need to strictly construe the statute.[6] (Majority Op. at 587.) Therefore, the Majority concludes that the Model 1010–BV does not qualify for the "dispensing machine" exemption in section 3 of the Act. For the reasons that follow, I disagree.

Section 3 of the Act, 10 P.S. § 313 (emphasis added), states that no pull-tab game "shall be played by or with the assistance of any mechanical or electrical devices or media *other than a dispensing machine or passive selection device....*" The Majority once again fails to properly analyze section 3 of the Act. Instead of examining the definition of the phrase at issue here, i.e., "dispensing machine," the Majority focuses on the word "passive" in the phrase that follows, thereby reading into the statute the requirement that a "dispensing machine" must be "passive." Such a reading is contrary to the plain language of the Act.[7] A proper analysis of the Act demonstrates that the Model 1010–BV is merely a "dispensing machine."

Section 3 of the Act, 10 P.S. § 313 (emphasis added), defines a "dispensing machine" in the following way:

"**Dispensing machine.**" A device designed *exclusively* for the dispensing of the games of chance authorized by this act, including, but not limited to, ticket jars, fish bowls and *stamp machines. Nothing in this act shall be construed to authorize devices commonly known as "slot machines" or "video poker."*

6. Section 2 of the Act, 10 P.S. § 312, states in pertinent part:
   It is hereby declared to be the policy of the General Assembly that ... all laws ... with respect [to the licensing, operation and regulation of small games of chance] ... should be strictly construed and rigidly enforced.

7. The phrase "passive selection device" does not stand in apposition to the phrase "dispensing machine." Rather, these phrases refer to two distinct types of devices or machines. Furthermore, the statutory definition of "dispensing machine" nowhere uses the word "passive."

Here, the General Assembly states with clarity its primary concern, i.e., that video poker, slot machines or other gambling devices should not be construed to be "dispensing machines." In other words, the General Assembly's definition of a "dispensing machine" excludes gambling devices, which "play" the game by the mechanical and electrical parts therein and thereby determine a winner. Because the Model 1010–BV is not a gambling device that determines a winner by the operation of its mechanical and electrical components, it is merely a "dispensing machine" as contemplated by the General Assembly in section 3 of the Act.

The regulations promulgated under the Act reinforce this interpretation. By statute, a "stamp machine" is a "dispensing machine." The regulations provide the following definition:

Stamp machine—A device designed *exclusively* to dispense preprinted pull-tab tickets *which does not make a change to, mark on or alter in any way the ticket placed in the device. The device may not print or produce tickets in any manner.* The term is also known as a vending machine for pull-tab tickets.

61 Pa.Code § 901.1 (emphasis added). Thus, the requirements for a "stamp machine" are: (1) it should not print or produce a pull-tab ticket, and (2) it should not make a change to, mark on or alter in any way a pull-tab ticket placed therein. Because the Model 1010–BV complies with these requirements, it is a "stamp machine" as defined by the regulations. As such, it is also a "dispensing machine."[8]

8. I note again that the Department previously approved Major's Model 1010–B even though it was capable of producing lights and sounds that announced the dispensing of a winning ticket. If this court now applied the strict construction propounded by the Majority to the Model 1010–B, we would have to conclude that the active nature of the device precludes it from being a "dispensing machine." However, the Majority has once again failed to explain how the Department, whose position the Majority supports, could approve the Model 1010–B but disapprove the Model 1010–BV.

I do not believe that this court should condone administrative actions that appear to be totally arbitrary. The Department cannot interpret the statute one way with respect to the Model 1010–B and then read it

Accordingly, because the Model 1010–BV does not "play" or assist in the "play" of the pull-tab game and is merely a "dispensing machine" under section 3 of the Act, I would reverse.

another way in evaluating the Model 1010–BV. Such reversals in position can only confuse the regulated community, which, in this case, has invested time, effort and money in developing a new product based upon the Department's prior ruling.

The regulated community deserves consistency on the part of the agencies. The approval or disapproval of applications to the Department should be more predictable than a game of chance. Here, the Department's position was correct the first time. This court will not improve matters by permitting the Department to flip a coin in a given situation for its interpretation of the Act. This court should be providing solid guidelines for the agency and the regulated community concerning the meaning of the Act. The Majority decision as written does not do that.