CHARLES D. GAITHER, Police Commissioner, *v.* FRANK CATE.

[No. 63, October Term, 1928.]

*Decided January 16th, 1929.*

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Willis R. Jones, Assistant Attorney General,* and *William L. Marbury,* with whom was *Thomas H. Robinson, Attorney General,* on the brief, for the appellant.

*Robert F. Leach, Jr.,* and *Richard E. Preece,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

The appellee in this case is the owner of a hundred machines by which certain confections or mints are delivered to patrons upon the placing of a nickel in a slot at the upper part of the machine. In addition to the mechanism which results in the sale of a package of mints for five cents, the machine has a certain other mechanical contrivance which does other things which will be later referred to more particularly. The police commissioner of Baltimore City gave instructions to seize the machines of the appellee and all other similarly constructed and operated machines in Baltimore City. Learning of such order, the appellee filed his bill of complaint in the Circuit Court of Baltimore City, praying for an injunction restraining the commissioner and the police authorities from seizing and confiscating the machines in question unless and until the particular machine sought to be confiscated is shown to be used as a gambling device. After a hearing in open court the chancellor granted a permanent injunction in the following words: "That Charles D. Gaither, as police commissioner of the police department of Baltimore City, and any and all members of the police department of Baltimore City be and they are restrained and enjoined from in any way interfering, molesting, seizing, threatening to seize, or taking into custody or possession any vending machines which are being used, operated, leased or rented by the plaintiff, unless and until said vending machines are found to be illegally operating in violation of the gambling laws of the State of Maryland." From this decree the police commissioner has appealed.

The appellee urges two points, first, that the machines in question do not constitute gambling devices within the meaning of certain sections of article 27 of the Code; and, second, that equity has power to restrain arbitrary interference with the machines by the police commissioner. A considerable portion of the brief of the appellee is consumed in the citation of authorities and argument on the second point; but we do not deem it necessary to dwell at any length upon the proposition there advanced, because we do not find that this

point is disputed by the appellant. Suffice it to say in this regard that there can be no question that a court of chancery is the proper tribunal and has the power to restrain the unwarranted and illegal interference by the police authorities with the property or property rights of an individual, either because there is no warrant in law for the exercise of the attempted interference with such property or property rights, or because of the illegal methods employed in the exercise of the authority which he has; in other words, either because of the absence of authority, or the abuse of the authority sought to be exercised. The case before us does not present such an issue. The question here is not whether a court of equity has the power to issue an injunction, but whether, under the facts as disclosed by the record, it should issue the injunction. The question is not one of power or authority on the part of the court, but whether it is proper to exercise that power in restraining the appellant in such a case as is presented by this record. The real and controlling question in this case, therefore, is whether the use of the device, spoken of in the record sometimes as a slot machine and sometimes as a vending machine, is prohibited by the statutes of our state.

The first contention of the appellant is that the use of the device here in question, in the manner in which the record shows it to have been used, is in violation of section 349 of article 27 of the Code, which reads: "No person or body corporate shall be permitted, either directly or indirectly, by agent or otherwise, to barter, sell or trade, or to offer for barter, sale or trade, by any publication, or in any way, any wares, goods or merchandise of any description, in package or bulk, holding out as an inducement for any such barter, sale or trade, or the offer of the same, any scheme or device by way of gift enterprise of any kind or character whatsoever"; and, second, that the appellee, by the use of the devices in the manner described in the record, is guilty of a violation of section 68 of article 27, which provides: "Any person who, with intent to cheat or defraud the owner, lessee, licensee or other person entitled to the contents of any auto-

matic vending machine, slot machine, coin box telephone or other receptacle, depository or contrivance designed to receive lawful coin of the United States of America in connection with the sale, use or enjoyment of property or service, or who, knowing that the same is intended for unlawful use, shall manufacture for sale, or sell or give away any slug, device or substance whatsoever intended or calculated to be placed or deposited in any such automatic vending machine, slot machine, coin box telephone, or other such receptable, depository or contrivance, shall be guilty of a misdemeanor, and upon conviction thereof, before any court of competent jurisdiction, shall be punished by a fine not exceeding $500.00, or by imprisonment not to exceed three months, or both, in the discretion of the Court."

Section 257 of article 27 provides: "The courts shall construe the preceding sections relating to gambling and betting liberally, so as to prevent the mischiefs intended to be provided against." The section last quoted follows a number of sections of the Code, beginning with section 244, under the general subdivision of "Gaming," and refers specifically to the preceding sections, and was enacted in 1842. While it is true that section 349, which is classified under the subdivision "Lotteries," was not passed until after 1842, and therefore it can be argued that section 257, as to the construction of gambling statutes, could not apply specifically to an act passed after 1842, nevertheless, we take it that section 257 is an expression by the Legislature of the policy of the State in respect to the construction of gambling statutes generally, and requires the courts to construe statutes prohibiting and penalizing the use of gambling devices liberally, so as to prevent the mischiefs which the Legislature sought to repress. By that section it was, in effect, stated by the Legislature to the courts that, whenever the Legislature enacted statutes having for their object the repression of gambling, in respect to such statutes the rule of strict construction should be reversed, and the courts should so construe them as to give validity not only to the word, but to the spirit of the law. According to our view, it is incumbent upon the

courts to give force and effect to the legislative mandate contained in this section of the Code, and to construe liberally statutes aimed and intended to prevent gambling, in order to effectuate the legislative intent and purpose; and therefore this statutory rule of construction should be applied to all gambling statutes without regard to whether they were enacted before or subsequent to section 257.

The record discloses that the machine in question has the general appearance of a cash register. Through the glass front is visible the character of merchandise with which it is loaded, in this particular instance the merchandise being small cylinders of mint wafers, each package marked to retail at five cents, and costing the appellee, in $1,000 purchases, one and a quarter cents each. On top of the box is a slot in which to deposit a nickel. On the right side of the box is a lever, the pulling of which releases the coin, and when the coin falls it releases one package of merchandise to a lower tray; it then requires the turning of a ratchet or wheel to throw the merchandise from the tray to the hand of the purchaser. Directions for operation of the machine are printed on its face. In addition, there is under a glass slide an indicator resembling a speedometer on a motor. This indicator automatically sets itself with the letters "no" or the figures 2, 4, 6, 8, 10, 12, 16 or 20; it acquaints one familiar with the operation of the machine as to whether or not, when a nickel is placed in the slot and the machine operated, in addition to the package of merchandise he will get a certain indicated number of metal discs or slugs, of the approximate circumference and thickness of a nickel. When the indicator shows the letters "no" it means no checks or slugs will be discharged, and when the indicator shows the figures as above set forth, from 2 to 20, it means that the operator, in addition to his package of mints, will receive the number of slugs or discs indicated by the figures then showing. In other words, if any of the figures appear in the dial, the operator knows that, in addition to the package of mints, the machine at the time of the delivery of the merchandise will also throw out a number of slugs, equal to the number

showing on the dial. These discs or slugs are yellow in appearance, with a hole in the middle, and have the appearance of an ordinary washer; they have on one side the words, "of no value, not redeemable," and on the other, "for amusement only." On the face of the machine there are the following words: "These tokens or slugs put in the machine will not be redeemed in cash or merchandise and machine will not dispense mints for brass tokens. They are for the amusement of patrons only. They remain part of the equipment, not to be removed." In addition to the dials indicated is another large dial on which three columns are visible. In these three columns are figures of oranges, lemons, cherries and other symbols. These symbols revolve with the release of the lever when either money or checks are placed in the money receptacle and the lever pulled, and when the revolution ceases they form certain combinations. These combinations also indicate how many checks are going to be thrown out.

The mechanism of the machine is such that, whenever a nickel is placed in the slot and the machine operated, there will certainly be discharged a uniform package of mints, marked to retail for five cents, although the flavoring of the mint which one will receive is not indicated in advance and can only be known after the package is discharged from the machine. No money can be inserted in the machine if the machine is empty of mints. If the machine is operated by placing a nickel in the slot while the indicator shows the word "no," the only thing which will be received will be a package of mints, but by this operation the cylinders upon which the symbols are will revolve, and at the end of this operation the indicator may point to "no" or to the said figures from 2 to 20. If the indicator points to "no," it would mean that the insertion of another nickel and the repetition of the first operation would result only in getting another package of mints; but if the indicator pointed to 20 it would mean that by the second operation, in addition to the package of mints, the machine would discharge 20 of the yellow discs. These discs can be put back in the machine, in the

money slot; and when a yellow disc is used instead of a nickel, the operation of the machine is the same as when the nickel is used, with the exception that no mints will be thrown out. In other words, if a person approaches the machine and the indicator shows "no," he will receive for his nickel a package of mints and nothing else. By this operation, however, it will be determined whether, if he places the second nickel, he will get yellow discs in addition to his second package of mints. It may show that he will get none, or it may show that he will get as many as 20 discs. If he does get 20 discs, he can continue to operate the machine by depositing one disc at a time, with a chance of getting no discs in return, or as many as 20 for each operation. The record shows that these discs cost $18 a thousand, a certain number being furnished with each machine at its purchase; that the appellee agrees to keep each machine supplied with a sufficient number of these discs for its operation; that while the instruction on the machine is that these discs belong to the machine, the appellee testified that a patron or operator of the machine had a right to those thrown out during the time he operates it, and that he can take them away if he feels so disposed; that the appellee is the owner of a hundred of these machines, at a cost to him of $100 each; that he puts them out, under oral leases, in stores and other places throughout the City of Baltimore, but does not keep a record of his lessees; that at irregular intervals the appellee or his agent visits the places where the machines are being kept, unlocks the money receptacle, and divides the proceeds equally between himself and his lessee.

The record further discloses, and the chancellor finds the same as a fact, that machines of this identical type were originally constructed for the use of checks which were primarily designed to be redeemed in merchandise, and during such time these checks had printed thereon, "redeemable in merchandise." Later, after decisions of the courts of several states that such form of operation constituted gaming and that the machines were gambling devices, under the various statutes of these respective states, the inscriptions on the

checks were changed and made to read at the present time as heretofore indicated. So far as the operation of the machine itself is concerned, the only change, between the one now under consideration and those that have been held to be gambling devices, is that the checks which now may be discharged with the package of mints have a different inscription from those formerly used. In addition, the appellee contends that the practice of redeeming checks has been altogether abandoned, and that the owners or users of this machine are now governed by the inscription at present upon the checks, to wit, "For amusement only," and, "Of no value; not redeemable."

Although the evidence is not entirely clear on the subject, it is certain that the appellee, at the time he testified, had in the hands of lessees in Baltimore City at least thirty-three machines. Further, according to his testimony, he did not keep a record of his lessees, and could not remember them. He, however, brought into court a list of some of them. The appellant offered to prove that certain persons in Baltimore City, having in their possession or places of business machines exactly similar to those now in question, and operated in the same manner, had either been convicted of or pleaded guilty to violation of the anti-gambling statutes for the reason that they had redeemed the checks discharged by the machines in their possession; and objection to such testimony was sustained. In the view that we take of this case, we are of the opinion that this testimony should have been allowed and considered.

It is apparent from the whole of this record that the theory upon which the chancellor acted was that the injunction should be granted unless the appellant produced such evidence as would convict the appellee of a violation of the gambling statutes of the state. In our opinion there was error in the decree of the chancellor, due, we feel, to the adoption of the theory above stated. This case comes before the court, not on an attempted prosecution for the violation of the gambling statutes, but as an application to the conscience of the court, on behalf of the appellee, asking that the police au-

thorities be enjoined from the seizure and confiscation of his property or property in which he has an interest. Under such an application the court is not asked or required to determine whether or not the complainant has been guilty of an infraction of the criminal law, but what it should determine is whether or not the machine or device which is being seized or threatened with confiscation is what has been designated by some courts as an "evil chattel." In other words, the proceeding alleged as having been threatened by the police authorities is against the thing and not against the individual owner of the chattel.

The application to a court of equity for the issuance of a writ of injunction is always addressed to the sound discretion of the court, and the granting or refusal of the writ is to be determined by the chancellor acting upon all the circumstances of each particular case. The authorities appear to be in substantial accord on the point that a machine or device, like those now under consideration, is a gambling device if the checks discharged in varying and uncertain numbers are redeemed. In the annotations following the case of *State of Rhode Island v. Certain Gambling Instruments, etc.,* 38 A. L. R. 71, practically all the authorities dealing with a similar device are collected; they include decisions in the States of Alabama, Arkansas, Georgia, Indiana, Kentucky, Louisiana, Maine, Missouri, New Jersey, New York, Rhode Island, South Carolina, Tennessee, and the Dominion of Canada, and with practical unanimity hold as above stated. We do not understand that the soundness of such decisions is seriously questioned by the appellee. His contention is that the State must prove that these discharged checks are being redeemed by him or his lessees before the business such as he is now engaged in, in respect to these machines, can be interfered with by the police authorities.

In addition to the facts which we have mentioned, the record in this case further discloses that the metal discs which are discharged from this machine when operated, being of the approximate size of a nickel, are being used in large numbers in substitution for money in procuring telephone

calls. The evidence is that the complainant has a pay telephone in his private dining room, and that, covering about an eight months period prior to June, 1928, there were deposited in that telephone box these particular discs to the number of 1318, and for which the telephone company required the complainant to pay the sum of $65.90, being five cents each for the discs found in the telephone box. These discs, upon demand by the telephone company, were redeemed by the complainant. The evidence further is that large numbers were found deposited in other pay telephone boxes throughout the city, and while it is true that a number of various other substitutions for money were found in these boxes, the appellant offered to prove that over a considerable period 99 per cent. of the articles used to defraud the telephone company, by substitution for money, were discs discharged by machines or devices like those owned by the complainant.

The picture presented to the chancery court by this record is that of an owner of a hundred machines, manufactured and designed for gambling purposes, to which, upon manufacture, were added incidental appliances for the vending of packages of confection; this incidental purpose being clearly designed and intended to take the device outside of the gambling statutes; that the merchandise vended by these machines, while marked to retail at five cents per package, costs the retailer one and a quarter cents, very much less than the average package of confection which retails at five cents costs the vendor; that this merchandise is manufactured by the Mills Novelty Company, the manufacturer of the machine, although it is not the exclusive manufacturer of the confections used; that these machines are loaded with confections of four or five different flavors, but that a purchaser buying the confection through the operation of the machine has no way of knowing what flavor he will receive before it is discharged; that the metal discs, which the operator may or may not receive in varying amounts upon each play of the machine, constitute a very large percentage of the articles used to defraud the telephone company by being placed in its pay station boxes; and asking the chancellor to grant a writ of injunction

to restrain the law officers from interferring with the operation of such machines.

An examination of the decisions in which similar devices have been under consideration shows what the average man would expect to find, the exercise of the inventive and ingenious mind applied to the manufacture of these machines for the purpose of distributing throughout the country gambling devices, but which were, nevertheless, outside of the letter of the gambling statutes; and the same authorities show that they have uniformly failed to impress the court with the innocence of their purpose and device. In few cases have their subterfuges enabled them to escape criminal liability, and in no case which we have been able to discover has the protection of the chancery court been successfully invoked.

It is apparently the belief of people, engaged in an endeavor to violate the spirit but keep the letter of the statutes prohibiting gambling, that courts are blinded to facts which all others of average intelligence see and understand. There is no doubt in our mind that the real purpose of placing these machines, to be played and operated by the public, is to increase the sales of the merchandise by appealing to the gambling instinct, which is either active or latent in almost every individual. It must be apparent to all that the mechanism of this device, outside of that necessary for a simple vending machine, is complicated and costly, and would not be used if what the owner desired was only a vending machine. This, it seems to us, is conclusively demonstrated by the fact, which is evident, that if the mechanism of such a machine as this, other than the purely vending mechanism, was removed or locked, this machine would be a poor competitor of the ordinary vending machine, which is simply a substitute for a human salesman. If we put five different flavors of confection in this machine, and the same different confections in a machine constructed for vending alone, and place them side by side, this machine would receive little patronage, for the reason that a customer desiring a particular flavor would use the machine which

266

would discharge the flavor desired, and not the machine which might discharge any one of the five flavors which it contained. It therefore seems clear that the increased sales of confection made through the instrumentality of this device are due to something outside of the desire of the patron to purchase a five cent piece of confection. What, then, is the attraction to this device in preference to the simple vending machine? The answer is either that the operator, in addition to his merchandise, is furnished a certain varying amount of amusement in observing the revolving of the cylinders and the formation of different combinations of symbols thereon, or that the discs or checks will be redeemed at a certain figure, or that he desires to use them for the fraudulent purpose of placing them in coin slot boxes in substitution for money. We are morally certain that the second of these reasons, that is, the redemption feature, or the substitution of the checks for money, is the controlling factor influencing the use of these devices by the public. This being our conclusion, we, as a court of chancery, would be bound to refuse the injunction asked for.

But it is argued that the amusement afforded by the revolution of the cylinders during the operation is what attracts customers and increases sales of merchandise, and that, if this be true, the court ought not to refuse the injunction unless this innocent and legal hypothesis be shown to be incorrect, or, in other words, unless its illegal use be proven. We cannot accept this argument when addressed to a court of equity, because we conceive it to be the duty of such a court to refrain from restraining the law officers from seizure and confiscation of a device which, in its judgment, from a consideration of all the facts presented in the case, is to be used for illegal purposes. Referring to the last mentioned argument, even if we assume that the amusement afforded to the patron by the revolutions of the cylinders presenting different combinations of symbols attracts customers, we still have a game of chance, exciting the gambling instinct, which it is the declared policy of this state, as disclosed by the statutes against gambling and gambling devices, to re-

press. It is in strict accord with the fact to say that amusement is a thing of value, for it is probably true that more money is spent each year by the citizens of this country for that purpose than for any other. If the amusement feature is the controlling factor inducing the operation of this machine, such amusement is not furnished to all patrons at the same cost. According to the arrangement of this machine, one person, as a result of spending two nickels, may get ten times as much amusement as another who spends the same amount and goes through identically the same operation; because, assuming that the indicator points to the word "no" when each of the two parties begins the operation, the first one puts in a nickel and in return receives a package of confection, and is afforded the amusement of seeing the cylinders revolve for a certain length of time, after which operation the indicator may disclose the figure "20," which means that if the operator puts in a second nickel he will get another package of confection, be afforded the same amusement as at first, and receive twenty discs or checks, each one of which, upon being placed in the slot in the machine, although it will not produce any more confection, will afford the same amount of amusement as the nickel; while the second supposed operator, when he puts in his first nickel, would receive exactly the same as the first operator, but at the end of his operation the indicator might again disclose "no," which would mean that if he put in the second nickel he would receive only the confection and the amusement incident to the revolving of the cylinders for one additional time; so that the result of the expenditure of the two nickels by the two supposed operators, in so far as the amusement feature is concerned, would be totally different, and would be entirely dependent upon chance. We take it that it would not be seriously contended that, if each one of these checks, instead of affording the amusement incident to the revolving of the cylinders and the formation of combinations, could be used as a ticket to a moving picture show, and that for the expenditure of two nickels one operator might get no tickets and the other might get twenty, that it would not be

a gambling device. Yet in principle there is no essential difference between these two cases. The difference is in degree but not in kind.

It is argued by the appellee that each operation of the machine is a complete transaction, and that the operator knows before he deposits his nickel exactly what he will receive for that operation. This same contention has been repeatedly made in respect to these devices, and has been completely answered by the courts in the decisions to which we have referred. It is true that the operator knows what he will receive after each operation, if he stops after that operation, but in addition to receiving what he knows he will receive, there is the unknown quantity of what the machine will promise for another nickel, and the inclination to gamble is induced by just that factor. In the two cases of *Long v. State,* reported in 73 Md. 527, and 74 Md. 565, which were criminal prosecutions, our predecessors held that, where a person was charged with operating a gambling device, and that device might be put to a legal as well as illegal use, in order to convict, it must be shown that it had been put or was intended to be put to the illegal use. We are not to be understood as in any way changing or modifying that rule in cases similar to the one then under consideration. In *State v. Hawkins,* 95 Md. 133, involving the use of trading stamps, Judge Boyd, speaking for the court, said: "If the vendor holds out as an inducement to purchase his goods, wares and merchandise the giving of a stamp which will thus entitle the purchaser to something which is *uncertain, undetermined* and *unknown* to him at the time of the purchase, the transaction is certainly one bearing some 'semblance to lottery or gambling'—'involving the element of chance.' * * * But when they are led to believe that they have the chance of getting something in addition to their purchases, and especially when they do not know what it is to be, then it is unfortunately true that there are very many persons who would be thereby induced to make purchases who would not otherwise do so. The 'uncertain, undetermined or unknown' is what attracts a large class of people in every community

and it is dealing with the 'uncertain, undetermined or unknown' that has ruined many and the tendency to thus deal (appealing to the gambling instinct) is one of the evils of the present day."

It is not the evil incident to one transaction, because there may be no evil at all if confined to one operation, but the evil which we find in allowing this device to be put in places for operation by the public is in the inducement to people to engage in games of chance, educating and fostering the spirit of gambling; and it is that very thing which the Legislature intended to prevent and repress. As we have said, if the only thing these machines were used for was amusement, the method of affording that amusement, and the quantity thereof, is determined by chance, and while the appeal thereby made to gamble may not be as strong as where the stakes are greater, nevertheless, it does encourage such spirit. But aside from the question of amusement, as we have already indicated, it is our conclusion, reached from the record in this case, that these devices were manufactured and are being used for the purpose of gambling, and that a court of equity ought not to protect the device or the owner by granting an injunction in this case. From what we have said, it follows that the decree must be reversed.

*Decree reversed, and bill dismissed, with costs to the appellant.*