766 A.2d 1036

**CHESAPEAKE AMUSEMENTS, INC.,**

v.

**Robert B. RIDDLE.**

**No. 124, Sept. Term, 1998.**

Court of Appeals of Maryland.

Feb. 13, 2001.

John C. Richowsky, Friendship, for appellant.

Kathleen H. Dachille, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Elisabeth A. Sachs, Assistant Attorney General, on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, Rodowsky,*

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

**18**

CHASANOW,** RAKER, WILNER and CATHELL, JJ.

BELL, Chief Judge.

■ The issue this case presents is whether a dispensing machine with a video screen that displays the contents of the tickets that it dispenses and emits a musical tone that signals when a winning ticket is being dispensed is a "slot machine" prohibited by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 264B.[1] Seeking the answer, the appellant, Chesapeake Amusements, Inc., filed an action for declaratory judgment in the Circuit Court for Calvert County, naming the State's Attorney for Calvert County as the defendant.[2] That court declared that such a machine is an illegal slot machine. We

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

** Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

1. The definition of a "slot machine" is set out in Maryland Code (1957, 1996 Repl.Vol.), Art. 27, § 264B and reads as follows:

"Any machine ... is a slot machine within the provisions of this section if it is one that is adapted for use in such a way that, as a result of the insertion or deposit therein, or placing with another person of any piece of money, coin, token or other object, such machine ... is caused to operate or may be operated, and by reason of any element of chance or of other outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, coin, token or other object representative of and convertible into money, irrespective of whether the said machine ... may, apart from any element of chance or unpredictable outcome of such operation, also sell, deliver or present some merchandise or money or other tangible thing of value."

2. Prior to 1997, consistent with a letter, dated February 17, 1995, from the State's Attorney of Calvert County, "instant bingo (pull tabs) ... [could] be played utilizing vending machines equipped with a visual enhancement of the ticket actually purchased...." By letter dated February 27, 1996, responding to a letter from Senator Lawlah, Assistant Attorney General Rowe opined that the "player enhancement features" of the Lucky Tab II machine made it a slot machine, and, therefore, illegal pursuant to § 264B. Relying principally on this letter, the State's Attorney advised the appellant in 1997 that some or all of its instant bingo machines were considered by his office to be illegal.

shall reverse the judgment of the Circuit Court for Calvert County.

## I.

Maryland Code (1957, 1996 Repl.Vol.), Art. 27, § 259A (a)(2) authorizes commercial bingo in Calvert County and, in implementation of that authorization, permits the County Commissioners to issue various classes of licenses, including a "Class NG, beach license," "for the operating or conducting of games of bingo." § 259A (b).[3] Section 259A (a)(1) provides that " 'bingo' includes the game of instant bingo for a Class NG beach license.' " The holder of an NG, beach license is not limited in its seating or player capacity, *see* § 259A (b)(1), and is not restricted in the value of the prizes or awards it may give. *See* § 259A (b)(2).

The appellant is a for-profit Maryland corporation providing commercial bingo, including instant bingo, under a valid NG beach license, at its principal place of business, the Rod 'N Reel Restaurant, located in Chesapeake Beach, Calvert County, Maryland. At the time relevant to this action, i2t offered several ways for its customers to play bingo: (a) they could play the traditional live bingo game; (b) they could purchase instant bingo tickets, also known as "pull-tabs" or "pull-tab" tickets, from employees, who walk around the hall with large reels of tickets; (c) they could purchase paper pull-tab tickets from a dispenser, either a machine known as "Play & Win" or a machine known as "Lucky Tab II," the latter of which displays a video image of the symbols contained on the inside of each pull-tab dispensed; or (d) they could purchase the electronic version of the pull-tab ticket, using a machine known as the "Oasis." [4]

---

3. Although permitted to do so, *see* Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 259A, Calvert County has not enacted ordinances or adopted regulations to supplement the statute's provisions with respect to commercial bingo.

4. As it did with respect to the Lucky Tab II machines, the Circuit Court for Calvert County ruled that the Oasis machines are illegal slot

There is no dispute on this appeal as to the traditional bingo game, and the parties are in agreement as to how instant bingo works. As to the latter, the Agreed Statement of the Case states:

"Instant bingo tickets are often referred to as 'pull-tab tickets' or 'pull-tabs.' A customer purchases one or more instant bingo/pull-tab tickets from a 'game' or 'deal' of such tickets. All the tickets in a given deal are identical in their outward appearance; some of the tickets entitle the persons who purchase them to receive prizes of specified value. Winning tickets are those that contain symbols on the inside that match designated winning combinations of such symbols. The total number of instant bingo tickets in a deal is a large but finite number [5]; that number is determined when the deal is created or 'constructed' and does not change thereafter. The number of winning tickets at each prize level in a deal is also determined and known in advance; the winning tickets are randomly placed in the deal at the time the deal is constructed. Thus, the chances of purchasing a winning ticket are precisely calculable for the deal as a whole. As tickets (including winning tickets) are purchased, the chances of purchasing a winning ticket from among the tickets remaining in the deal will vary, but because the number of tickets involved is large and the tickets are purchased by many different individuals over a period of time, it is a practical impossibility for customers to calculate or even estimate how the chances of winning have been affected by previous purchases."

On this appeal, only the Lucky Tab II machine is at issue. Neither in the trial court nor in this Court has the legality of pull-tab tickets sold manually been challenged. The question in the trial court was whether any or all of the machines used

---

machines. That ruling has not been appealed and, thus, the legality of the Oasis machine is not at issue on this appeal.

**5.** For example, a deal of the pull-tab tickets sold manually by Chesapeake Amusements employees on a regular basis contains approximately four thousand tickets.

to dispense pull-tab tickets are prohibited slot machines. The circuit court determined, with respect to the Play & Win machine, that it was a simple pull-tab dispenser with no player enhancements and, therefore, a legal gaming device. By contrast, the court found both the Lucky Tab II and the Oasis machines illegal slot machines. It characterized the Oasis machine as "exactly the type of machine that the Legislature has sought to prohibit," noting that it is "entirely electronic" with a "number of player enhancement[s]" and a choice of games and concluding that the Oasis machine, rather than a pull-tab dispenser, was a machine which tracks a player's winnings and losses through "an internal credit system," such that the player is not responsible for identifying a winning ticket." The appellant appealed the ruling as to the Lucky Tab II machine, but not as to the Oasis machines, and the appellee has not sought review with respect to the Win and Play machines. Therefore, the correctness of those rulings is not now at issue.

Turning to the Lucky Tab II, it is an electrically operated machine that dispenses paper pull-tab tickets from a roll of preprinted paper pull-tabs inserted in the machine by a Chesapeake Amusements employee. Like the tickets that are sold manually or dispensed by the Play & Win machine, each ticket dispensed by the Lucky Tab II is part of a particular deal of outwardly identical tickets, in which the total number of tickets, as well as the number of winning tickets, were determined when the deal was constructed and printed. A deal of the Lucky Tab II pull-tab tickets consists of four rolls of tickets containing seven thousand five hundred tickets each, for a total of thirty thousand tickets in the deal, each having printed on it for accounting and control purposes, the serial number of that deal and a roll number and ticket number. The tickets dispensed consist of two strips of paper sealed together by the manufacturer when the ticket is printed. When the two strips are separated, certain symbols appear on the inside of the ticket and certain combinations of those symbols entitle the purchaser to a prize, the amount of which is also determined by those symbols. The front of the ticket

indicates to the purchaser where to pull it open. A winning ticket is labeled as such on the inside. In addition, the combinations of symbols that entitle the customer to a prize and the amount of the prize associated with each winning combination are listed on the front of the Lucky Tab II machine.

The agreed statement of facts detail the actual operation of the Lucky Tab II machine:

"A customer inserts money into the Lucky Tab II and pushes a button located on the front of the machine; a pull-tab ticket is then dispensed into a tray on the front of the machine. When a ticket is purchased from the Lucky Tab II, a bar code reading device in the interior of the machine reads the bar code on the back of the ticket as it is being severed from the roll of tickets and dispensed into the tray. The information from the bar code is used to create a video image of the symbols that appear on the inside of the ticket, and that image is then displayed on the video screen located on the front of the Lucky Tab II. The video image of the symbols on the inside of the ticket is displayed on the screen after a brief delay, which can vary from one machine to another and may be momentary or as long as six seconds after the ticket is dispensed. As in a retail store setting, the bar code reader also reads and records accounting information relating to the ticket purchase. The video display of a winning ticket is accompanied by a musical signal. Depending on the amount of money deposited into the machine by the customer, the dispensing button can be pushed again to dispense another ticket."

While a customer who purchases a pull-tab ticket from the Lucky Tab II may open the ticket manually and/or refer to the image on the machine's video screen to view the symbols on the inside of the ticket, the parties agree that it is only on the basis of the symbols that appear on the inside of the paper ticket that a winning ticket is determined. Thus, the symbols that are displayed on the video screen are not used to determine whether the customer is entitled to a prize. Moreover, the Lucky Tab II machine does not make any payment to or

record any credit on behalf of a customer as a result of a winning ticket. As is true with respect to manually sold tickets and those purchased from a Win and Play machine, a customer must take what he or she believes to be a winning ticket purchased from the Lucky Tab II to a Chesapeake Amusements employee to have the winning combination of symbols and the genuineness of the ticket verified before the prize associated with the symbols on the ticket may be awarded and paid.

Although not entirely electronic as is the case with the Oasis machine—the paper ticket being necessary, even dispositive, for payment, the Circuit Court concluded that the Lucky Tab II too fell in the category of a prohibited slot machine, adopting the Attorney's General's characterization: it is "a pull tab machine that reads the printed card and tells the player whether he or she has won, thus making the card unnecessary except as a voucher to get payment of winnings." It held that the operation of Lucky Tab II is prohibited by § 264B because it "entitles the player to 'receive or become entitled to receive any piece of money ... or other object representative of and convertible into money," one of the statutory criteria for a slot machine. Finally, relying on this Court's opinion in *Clerk v. Chesapeake Beach Park,* 251 Md. 657, 248 A.2d 479 (1968), the court determined that Lucky Tab II, as a " 'machine that furnishes gratification or reward to a winning player other than further free plays,' " was among those "intended to be banned by the General Assembly in enacting Article 27, § 264B."

We issued the writ of certiorari *sua sponte* to consider this important issue. We now reverse the judgment of the Circuit Court.

### A.

The appellant argues that Maryland's statutory prohibition of slot machines is aimed at devices that award prizes as a result of an element of chance in their operations. That is reflected in § 264B. Pursuant to the plain language of that

statute, which defines a "slot machine," such machines have three main elements, "consideration, chance, and reward," common to all gambling. *See State v. 158 Gaming Devices*, 304 Md. 404, 412–14, 425–26, 499 A.2d 940, 944–45, 951 (1985). First, the machine must operate "as a result of the insertion or deposit therein, or placing with another person of any piece of money, coin, token, or other object. . . ." Second, there must be an "element of chance" or other "outcome of [the] operation [of the machine] unpredictable by [the user of the machine]" that determines what the user receives as a result of operating the machine. Third, what the user "may receive or become entitled to receive" as a result of ("by reason of") the unpredictable operation of the machine, is "any piece of money, coin, token or other object representative of and convertible into money. . . ." As applied to the question of whether a machine is a slot machine under the statute, the appellant argues, the element of chance "must be in the operation of the machine, and the possibility of a prize must result from the chance in such operation."

Next, the appellant contends that all three elements of gambling are present in connection with a pull-tab ticket, but not with respect to a dispenser of those tickets. It maintains that while consideration is present, the elements of chance and reward are lacking in a pull tab dispenser. As to chance, the appellant asserts that the dispenser's operation is invariable, it does not operate in an unpredictable way. Similarly, with respect to reward; while the paper ticket that is dispensed may turn out to be an "object representative of and convertible into money, that fact, the appellant points out, is not "by reason of" any chance involved in the operation of the machine. Consequently, the appellant concludes, citing Maryland Code (1957, 1996 Repl.Vol.), Art. 27, §§ 237–240, 241, 242, and 244,

> "[i]f the sale of the pull-tabs that are in a dispenser . . . is not authorized by law, then the dispenser is illegal, but not because it is a slot machine. Pull-tabs are a form of gambling, and Maryland's array of general anti-gaming

statutes apply to their unauthorized sale, whether that is done manually or by means of a dispenser."

Furthermore, the appellant argues, § 264B does not support the conclusion that the Lucky Tab II is a slot machine. It noted that, in its February 1996 letter, the Attorney General conceded that machines, including the Lucky Tab II, that merely dispense paper pull-tab tickets are not thereby rendered slot machines, where such a machine "does not calculate odds, or pick the tickets sold randomly . . . ." and concluded that "[f]unctioning in this way, the machines are comparable to a cashier or bartender who sells instant bingo cards from the top of a stack." The appellant rejects the Attorney General's further conclusion that the machine becomes a prohibited slot machine, and thus contraband *per se*, with the addition of " 'player enhancement features' that enable the machine to tell the player that he or she has won."

In the appellant's view, no more chance exists with respect to the video image and audio signal ("player enhancement features") than with the dispensing of the pull-tab ticket. Nor is it accurate, the appellant maintains, for the Attorney General and the Circuit Court to characterize the pull-tab ticket dispensed by the Lucky Tab II as a "voucher" that is "unnecessary except . . . to get payment of winnings." The video image of the contents of the pull-tab and audio signal indicating a winning ticket are, the appellant argues, simply a byproduct of the dispensing function; they come into play only after a pull-tab ticket is dispensed. According to the appellant, this sequence refutes any argument that the player enhancement features make the Lucky Tab II a slot machine. It points out:

> "[w]hen a slot machine as defined in section 264B is operated, a prize determined as a result of the machine's unpredictable operation can only be delivered after that operation is completed. In the case of the Lucky Tab II, the pull-tab ticket is dispensed before the 'player enhancement features' begin, so there is no way that the pull-tab could be a

'voucher' representing a prize determined by those features."

Moreover, the appellant submits, because a winning pull-tab ticket is predetermined before being placed in the machine for dispensing and the "player enhancement features," indicating its contents, are activated only upon its dispensation, the test proposed by the Attorney General—"if the player can tell whether he or she has won by looking at, and listening to, the machine, and needs the card only to collect winnings, then the game is being played on the machine . . ."—is simply inapposite.

The appellant finds support for its arguments in the operation of the Win & Play machine, found by the trial court to be a mere dispenser of pull-tab tickets, a decision that the State, as we have seen, did not appeal, and the Tab Force Validation Unit, determined by the Attorney General not to be a slot machine.[6] With respect to the former, it points out that, but for the player enhancements, the operation of the two machines are identical. Like the Lucky Tab II, when the paper pull-tab is inserted into it, the validation unit will display the results and print a ticket, containing the result, for presenta-

---

**6.** In a letter, dated August 19, 1997, to Senator Edward J. Kasemeyer, in which she opined that the Tab Force Validation Unit was not a slot machine, Assistant Attorney General Rowe described the operation of the unit and concluded as follows:

"Under this system, the player buys a pull-tab from the cashier. The player opens the tab and can read it to see whether it is a winner, or can hand it to a cashier who can scan the bar code to determine [if] it is a winner, or, as a third option, the player can insert the pull-tab in the validation unit. If this option is used, the validation unit will display the results of the games that are on the card and will print a ticket with the results that can be given to the cashier for pay out. Under all three options, payout is made by the cashier.

"Under these facts, it is my view that the validation unit is not a slot machine. Consideration, chance, and prize, the three elements of gambling, exist in this instance completely separate from the machine. Payment is made to the cashier, not to the machine. While a thing that may have value is inserted in the machine, the machine returns something of identical value. The chance element is on the card. The winnings are known, or knowable without the machine, and the machine has no effect on the amount of the winnings. The third element, prize, is also separate from the machine."

tion for payout. The appellant contends that everything about the validation unit, except how the pull tab is purchased,[7] is equally applicable to the Lucky Tab II, *i.e.* "[t]he chance element is on the [pull tab ticket]. The winnings are known, or knowable without the machine, and the machine has no effect on the amount of the winnings."

## B.

For the appellee, the central question in this case is whether the statutory provision prohibiting slot machines in Maryland permits a distinction to be drawn between pull-tab dispensing machines without player enhancement features and those machines with player enhancement features. The answer, it submits, turns on the interpretation of the element of "chance" under § 264B, particularly with respect from whose perspective it is viewed. According to the appellee, "the language of the statute supports an approach which measures the element of chance from the player's standpoint and specifically considers whether a machine's audio-visual features signal to the player that the element of chance is in the machine."

Recognizing that its interpretation is somewhat expansive and the appellant's more restrictive, the appellee argues that the appellant's interpretation of § 264B is inconsistent with both this Court's cases broadly interpreting Maryland's slot machine law and the well-settled principle, stated in Md.Code (1957, 1996 Repl. Vol.), Art. 27, § 246, that the general prohibition against slot machines is to be liberally construed. Noting that the legal slot machine is the exception, not the rule, the appellee points out that the General Assembly's authorization of slot machines, in limited circumstances by certain organizations in specific counties, has been expressly done. No such authorization has expressly been made in the case of Calvert County, it asserts.

---

7. There is a further difference, the validation unit prints the ticket on which the pay out is made.

## II.

We are in agreement with the appellee that the critical question to be resolved is whether the statutory provision prohibiting slot machines in Maryland permits a distinction to be drawn between pull-tab dispensing machines without player enhancement features and those machines with player enhancement features. We also agree that the answer to the question lies in the interpretation of the "chance" element of the statute. This involves statutory interpretation.

Repeatedly we have said "that the cardinal rule of statutory construction is to ascertain and effectuate legislative intention." *Mayor and City Council of Baltimore v. Chase*, 360 Md. 121, 128, 756 A.2d 987, 991 (2000); *State of Maryland v. Crescent Jaycees Foundation, Inc.*, 330 Md. 460, 468, 624 A.2d 955, 959 (1993) (*citing State v. Bricker*, 321 Md. 86, 92, 581 A.2d 9 (1990)); *Privette v. State*, 320 Md. 738, 744, 580 A.2d 188, 191 (1990); *Jones v. State*, 311 Md. 398, 405, 535 A.2d 471, 474 (1988). In *Chesapeake and Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor and City Council of Baltimore*, 343 Md. 567, 578–79, 683 A.2d 512, 517–18 (1996), this Court set out some of the well settled rules governing that search:

"[W]e begin our analysis by reviewing the pertinent rules [of statutory construction]. Of course, the cardinal rule is to ascertain and effectuate legislative intent. *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995); *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448, 451 (1994); *Condon v. State*, 332 Md. 481, 491, 632 A.2d 753, 755 (1993). To this end, we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also. *Oaks, supra*, 339 Md. at 35, 660 A.2d at 429; *Buckman, supra*, 333 Md. at 523, 636 A.2d at 451; *Condon, supra*, 332 Md. at 491, 632 A.2d at 755; *Harris v. State*, 331 Md. 137, 145–46, 626 A.2d 946, 950 (1993).

"Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect

an intent not evidenced in that language,' *Condon, supra,* 332 Md. at 491, 632 A.2d at 755, nor may it construe the statute with "forced or subtle interpretations' that limit or extend its application." *Id.* (*quoting Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 73, 517 A.2d 730, 732 (1986)). Moreover, whenever possible, a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. *Buckman, supra,* 333 Md. at 524, 636 A.2d at 452; *Condon, supra,* 332 Md. at 491, 632 A.2d at 755."

Our cases are also clear that, "in the interest of completeness," the legislative history of an unambiguous statute or other materials that may shed light on the fundamental issue of legislative goal or purpose may be consulted. *See e.g., State v. Thompson,* 332 Md. 1, 7, 629 A.2d 731, 732 (1993); *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946, 950 (1993). We made clear in *Chase,* however, that:

"We ... look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account. ... In other words, the resort to legislative history is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute."

*Id.* at 131, 756 A.2d at 993, *citing Harris,* 331 Md. at 146, 626 A.2d at 950. *See also Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977) ("a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature.").

■ For a machine, apparatus or other device to be a slot machine, its operation must be characterized by an element of chance, as a result of which the user of the machine apparatus or device may receive or become entitled to receive a prize or reward. On these points § 264B is clear and unambiguous. It defines a slot machine as:

"[A]ny machine, apparatus or device ... adapted for use in such a way that, as a result of the insertion or deposit therein or placing with another person of any piece of

money, coin, token other object, [it] is caused to operate or may be operated, and by reason of any element of chance or of other outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, coin, token or other object representative of and convertible into money."

The critical relationships are clear: the machine or device must operate "as a result of" money or other objects, either inserted into the machine or device or given for that purpose to another person and the user's receipt or entitlement to receive money or other object representative of and convertible into money is "by reason of any element of chance or of other outcome of such operation unpredictable by" the user. In other words, there must be consideration supplied by the user on the possibility that he or she will receive a prize "by reason of" the unpredictable operation of the machine. The Lucky Tab II machine does not meet this definition any more than the Play & Win machine does.

The Lucky Tab II machine does not pick the paper pull-tab tickets sold in a random fashion. Indeed, the agreed statement of facts indicates that such tickets are dispensed in sequence from the deal placed into it by the appellant's employee. Nor does it calculate odds. When a customer purchases a ticket from the Lucky Tab II, it is detached in sequence from the deal. The Attorney General opined in a February 19, 1993 opinion letter, that without player enhancements, the Lucky Tab II is "comparable to a cashier or bartender who sells instant bingo cards from the top of a stack." As that is being done, a bar code reading device in the interior of the machine reads the bar code on the back of the ticket. From the information encoded in the bar code, a video image of the symbols that appear on the inside of the ticket is created and, after the pull-tab has been dispensed and a brief delay up to six seconds, displayed on the video screen located on the front of the machine. When the pull-tab is a winner, the video display is accompanied by a musical signal. Thus, it is the purchase of the paper pull-tab that activates the player enhancement features. And, because the paper pull-tabs also

determine the outcome of the game, it is with the paper pull-tabs with which the game is played. The player enhancement features, the video and audio, respond only to the information contained in the paper pull-tabs and, therefore, have no ability to affect the outcome of the game; the outcome of the game is set once the paper pull-tab is purchased non-randomly.

The appellee does not dispute this analysis directly. Rather, the appellee focuses on the chance element of the slot machine definition, and especially the fact that it is stated from the user's perspective. Then, noting Art. 27, § 246 and its requirement of liberal construction of the gambling and betting laws "so as to prevent the mischiefs intended to be provided against," [8] the appellee posits that, rather than actual chance, all that the Legislature intended was "the sense of unpredictability as to whether the machine will dispense a winning ticket." From that premise it argues that the statute is entitled to a broad interpretation that will accomplish that goal. The appellee concedes that "this Court has not specifically considered § 264B's element of chance requirement in isolation, nor expressly examined the relationship between the player and the operation of an instant bingo or video pull-tab machine." Nevertheless, it relies on those cases that have interpreted § 264B in other contexts, *State v. 149 Slot Machines*, 310 Md. 356, 362, 529 A.2d 817, 820 (1987); *State v. 158 Gaming Devices*, 304 Md. at 437, 499 A.2d at 957; *Clerk v. Chesapeake Beach Park*, 251 Md. at 667, 248 A.2d at 484, pointing to the broad interpretations they have given it, and this Court's use of § 246 when interpreting other gaming provisions.

Also persuasive to the appellee are out of State cases which have used the player's perspective to distinguish the Lucky Tab II dispensing machine from those without "bells and whistles." *Major Mfg. Corp. v. Department of Revenue*, 168

---

**8.** Maryland Code (1957, 1996 Repl.Vol. ), Art. 27 § 246 provides:
"The courts shall construe the preceding sections relating to gambling and betting liberally, so as to prevent the mischiefs intended to be provided against."

Pa.Cmwlth. 577, 651 A.2d 204, 208 (1994), *appeal denied,* 542 Pa. 637, 665 A.2d 471 (1995); *Diamond Game Enterprises, Inc. v. Reno,* 9 F.Supp.2d 13, 20–21 (D.D.C.1998); *Sycuan Band of Mission Indians v. Roache,* 54 F.3d 535, 543 (9th Cir.1994), *cert. denied,* 516 U.S. 912, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995). In *Major Mfg. Corp.,* the Pennsylvania Small Games of Chance Board argued "that, due to the video display screen as well as the music and lights, which are programmed to reveal to the player whether the ticket is a winner or loser, the act of play could be perceived as being assisted by mechanical or electrical devices." 651 A.2d at 206.

### III.

To be sure, as the appellee accurately points out, this Court has applied § 246 to the interpretation of § 264B, *see State v. 149 Slot Machines,* 310 Md. at 362, 529 A.2d at 820; *State v. 158 Gaming Devices,* 304 Md. at 437, 499 A.2d at 957; *Clerk v. Chesapeake Beach Park,* 251 Md. at 667, 248 A.2d at 484, and other gaming provisions. *See also State v. Crescent Cities Jaycees Foundation,* 330 Md. 460, 624 A.2d 955 (1993) (harmonizing § 255(b), which permitted certain gambling activities by charitable organizations, but explicitly prohibited individuals or groups of individuals from benefitting financially from that activity, and § 258B, permitting charitable organizations to conduct 'benefit performances,' denominated as 'casino nights,' where designated gaming events were allowed). Indeed, in *Gaither v. Cate,* 156 Md. 254, 144 A. 239 (1929), we said of Md.Code (1939, 1996 Repl.Vol.), Art. 27, § 257, the predecessor of § 246:

"[W]e take it that section 257 is an expression by the Legislature of the policy of the State in respect to the construction of gambling statutes generally, and requires the courts to construe statutes prohibiting and penalizing the use of gambling devices liberally, so as to prevent the mischiefs which the Legislature sought to repress. By that section it was, in effect, stated by the Legislature to the courts that, whenever the Legislature enacted statutes having for their object the repression of gambling, in respect to

such statutes the rule of strict construction should be reversed, and the courts should so construe them as to give validity not only to the word, but to the spirit of the law." 156 Md. at 258–259, 144 A. at 240.

In none of those cases was the issue that this case presents, the proper interpretation of the chance element of the statutory definition of slot machine, before the Court. In *149 Slot Machines,* the question presented was "whether the phrase 'any other gaming device' in § 255(b) encompasses slot machines otherwise prohibited by § 264B." 310 Md. at 357–58, 529 A.2d at 819. It was § 264B's prohibition of the location, possession, keeping, maintenance or operation of any slot machine in Maryland juxtaposed against § 255(b)'s authorization of certain nonprofit organizations in certain counties to engage in gambling activities for fundraising purposes, using "devices as are commonly designated as paddle wheels, wheels of fortune, chance books, bingo, or any other gaming device ...," *id.* at 357, 529 A.2d at 817, that generated the issue.

At issue in *158 Gaming Devices,* 304 Md. at 406, 499 A.2d at 941, were "a number of devices seized as illegal 'slot machines' " pursuant to § 264B. Some of the devices were inoperable, others were free-play devices without knock-off switches or meters, and still others were "antique" slot machines.[9] *Id.* at 407, 499 A.2d at 942. The trial court found that the inoperable devices and free-play devices without knock-off switches were not slot machines and that the antique

---

9. Paragraph V of § 264B, as originally enacted by ch. 280 of the Acts of 1981, defined "antique" slot machines as follows:

 " ... a slot machine is an antique slot machine if the defendant shows by a preponderance of the evidence that it was manufactured prior to 1941."

 It also provided that a showing, "that the slot machine is an antique slot machine and was not operated for gambling purposes while in the defendant's possession" was a defense to a prosecution and that, "[w]henever this defense is offered, no slot machine seized from any defendant shall be destroyed or otherwise altered until after a final court determination including review upon appeal, if any, that the defense is not applicable. If the defense is applicable, the slot machine shall be returned pursuant to provisions of law providing for the return of property."

"slot Machines" were exempt. *Id.* In addition to affirming the trial court's ruling with respect to the antique "slot machines" and the inoperable devices, this Court rejected the State's "contention that under § 264B a free play of itself, registered upon a device the operation of which involves the element of chance, is an object representative of or convertible into money because it is the 'functional equivalent' of the coin or token otherwise necessary to activate the machine," *id.* at 432, 499 A.2d at 954, holding, instead, that such devices are illegal only when "equipped with odds mechanisms, or a meter for recording the number of free plays released, or other established indicia of a gambling device." *Id.* at 436, 499 A.2d at 956–57.

*Chesapeake Beach Park* examined the effect of § 264B on local laws in Calvert County that authorized the possession of coin-operated mechanical and electrical "amusement" devices, which awarded free plays that could be redeemed for merchandise, rather than cash pay-offs. This court, noting the liberal construction which § 246 requires be given to the gaming laws and after studying the legislative history of § 264B, held that possession of such machines was banned by § 264B; we determined that the General Assembly intended to ban "any ... machines that furnished gratification or reward to a winning player other than further free plays." 251 Md. at 666, 248 A.2d at 484.

Liberal interpretation is a rule of construction. Like other rules of construction, its purpose is to construe an ambiguous statute, not to rewrite a clear one. In another context, involving another statutory scheme, Worker's Compensation, social legislation, which the General Assembly has determined to warrant liberal interpretation, *see* Md.Code (1999) § 9–102 of the Labor & Employment Article; [10] *Balti-*

---

10. Md Code (1999) § 9–102, titled "Construction," provides:
 "(a) This title shall be construed to carry out its general purpose.
 "(b) The rule that a statute in derogation of the common law is to be strictly construed does not apply to this title."

*more v. Cassidy,* 338 Md. 88, 97, 656 A.2d 757, 761 (1995), we have said:

> "Although we acknowledge that Maryland's [Workers' Compensation] Act 'should be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes [and that] [a]ny uncertainty should be construed in favor of the claimant . . ., we "may not disregard the plain meaning of the Act in the name of liberal construction. . . ."

*Porter v. Bayliner Marine Corp.,* 349 Md. 609, 616–17, 709 A.2d 1205, 1208–09 (1998) (citation omitted). In any event, the cases on which the appellee relies do not make the point. *Chesapeake Beach Park* comes closest. There, "in the performance of our judicial duty to liberally construe gaming statutes to give effect to an ascertained legislative intent," the Court construed, " 'representative of and convertible into money' to mean representative of or convertible into money." 251 Md. at 667, 248 A.2d at 486. We made clear, however, that the construction was derived from the words of the statute:

> "Section 264B provides that a winning player may receive or become entitled to receive money or some equivalent as a result of the operation of the machine brought about by the insertion or deposit therein, or placing with another person of any piece of money, coin, token or other object, (emphasis added) and, in addition, does not limit or restrict the manner or way in which a winning player may 'become entitled to receive' his award. The phraseology of the statute leads to the conclusion that evidence of the reward or the material reward itself may, without distinction and with the same consequences, come directly from the machine or from an attendant of the machine, and in every instance of material reward by chance the machine would be a slot machine,"

*id.,* and that, quoting 2 Sutherland, *Statutory Construction,* § 4923 (3rd Ed.1943):

> "There has been . . . so great laxity in the use of these terms ('and' and 'or') that courts have generally said that

the words are interchangeable, and that one may be substituted for the other, if to do so is consistent with the legislative intent."

*Id.* Thus, *Chesapeake Beach Park,* rather than conflicting with the construction urged by the appellant, is consistent. In fact, it is simply an example of the Court interpreting an ambiguous statute.

Nor are the out-of-state cases, on which the appellee relies, of any more assistance. The Pennsylvania statute construed in *Major Mfg. Corp.,* differs significantly from § 264B. It defines "Games of Chance" as:

"Punchboards, daily drawings, raffles and pull-tabs, as defined in this act, provided that no such game shall be played by or with the assistance of any mechanical or electrical devices or media other than a dispensing machine [11] or passive selection device and further provided that the particular chance taken by any person in any such game shall not be made contingent upon any other occurrence or the winning of any other contest, but shall be determined solely at the discretion of the purchaser. This definition shall not be construed to authorize any other form of gambling currently prohibited under Title 18 of the Pennsylvania Consolidated Statutes (relating to crimes and offenses). Nothing in this act shall be construed to authorize games commonly known as 'slot machines' or 'video poker.' "

10 P.S. § 313.

After describing the operation of the Lucky Tab II, *i.e.,*

"[u]nlike the [Lucky Tab I] model, however, the more highly advanced [Lucky Tab II] model has a bar code scanner which scans the exact contents of the pull-tab ticket and

---

**11.** Section 3 of the Pennsylvania Local Option Small Games of Chance Act, defines a "dispensing machine" as,

"a device designed exclusively for the dispensing of games of chance authorized by this act, including, but not limited to, ticket jars, fish bowls and stamp machines. Nothing in this act shall be construed to authorize devices commonly known as 'slot machines' or video poker."

then causes the image on the ticket to be displayed on video. The scanner 'is the interpreting network of the [video] display.' The display element of the device consists of a picture tube 'that displays the image that's on the ticket.' After the player inserts a dollar bill, the device's lights illuminate and the player has the option of next tab and pull. When the player is a winner, the top light illuminates. In addition, after the video display, the device emits a musical jingle from which the player can determine whether he is a winner or a loser. Therefore, on the basis of either the video display, lights or music, the player knows whether he is a winner or loser without ever having to open the pull-tab,"

the court, *id.* at 206, applied the statute, agreeing with the Pennsylvania Small Games of Chance Board that "components of the device assist in the play of the game," 651 A.2d at 205, and, so, the Lucky Tab II is not a mere dispensing device. *Id.* at 208. Rejecting the petitioner's argument that the proper test is whether the three elements of a game of chance are assisted, the court concluded that it is, rather whether the game is played by or with the assistance of mechanical or electrical devices, explaining "a player may rely on the video display and discard the losing ticket without ever opening it ... [and], also without opening the ticket, a player may alternatively rely on the device's electronic sound or its lights in determining whether he is a winner." 651 A.2d at 208.

The inquiry under § 264B is quite different; it is whether the Lucky Tab II is a slot machine, which necessarily involves the question whether the element of chance is required by § 264B to be in the machine directly or simply perceived to be, as the appellee contends.

*Diamond Game Enterprises, Inc. v. Reno,* 9 F.Supp.2d 13 (D.D.C.1998) and *Sycuan Band of Mission Indians v. Roache,* 54 F.3d 535, 543 (9th Cir.1994), *cert. denied,* 516 U.S. 912, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995) were decided under the federal Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701–19.[12] One of the questions in *Diamond Game* was

---

**12.** The IGRA regulates gambling operations run by Indian tribes.

whether the Lucky Tab II was a Class II or a Class III gaming device as defined under that act. Class II gaming devices [13] include "electronic, computer, or other technological aids" to the traditional pull-tab game. 25 U.S.C. § 2703(7)(A)(i). Class III gaming devices are those that are "[e]lectronic or electromechanical facsimiles of any game of chance." 25 U.S.C. § 2703(7)(B)(ii). The District Court held that the Lucky Tab II was a facsimile, a Class III gaming device, reasoning:

> "When the participant plays the Lucky Tab II, she is not playing the pull-tabs inside the machine; she is engaging the machine that replicates the functions of the traditional pull-tab game. Indeed, the Lucky Tab II performs all of the functions that a player of the traditional pull-tab game would have performed, including selecting a pull-tab ticket, disclosing the hidden symbols on the ticket and determining whether a particular pull-tab ticket is a 'winner.' "

*Id.* at 20–21.

Similarly, in *Sycuan*, the United States Court of Appeals for the Ninth Circuit concluded that the video pull-tab machine at issue in that case, the Auto Tab Model 101, was a Class III gaming device. *See* 54 F.3d at 543. Like the *Diamond Game* court, the court believed that the video pull tab machine is integral to the play. It opined:

> "[A]ny given player is faced with a self-contained machine into which he or she places money and loses it or receives winning tickets after the electronic operations are conducted.... In that sense, the gambler plays 'with the machine' even though not against it."

54 F.3d at 543.

Decided on the basis of different statutory language and an entirely different statutory scheme, these cases are certainly not directly on point and for those same reasons are not particularly persuasive with respect to the interpretation of § 264B. Indeed, the court in *Sycuan* commented, in refusing

---

13. Class II gaming includes pull-tabs. *See* 25 U.S.C. § 2703(7)(A).

to consider the rationale underlying the exclusion of facsimiles, that "Congress has sufficiently dictated the result of this case in the statutory language it chose." 54 F.3d at 543. *Sycuan* is further undermined by the fact that the machine it analyzed was not the Lucky Tab II, but rather one akin to the Oasis, found by the trial judge to be a slot machine and not appealed by the appellant. It is undisputed, as the trial court held, that the Oasis is a wholly electronic pull-tab machine, unlike the Lucky Tab II.

The District Court decision in *Diamond Game* has been overruled. *See Diamond Game Enterprises, Inc. v. Reno,* 230 F.3d 365 (D.C.Cir.2000). While the statutory language and scheme continue to make this case inapposite, the appellate court's analysis of the Lucky Tab II's operation is interesting and, more to the point, reminiscent of the appropriate analysis in this case. Contrasting the Lucky Tab II with the video pull-tabs game at issue in *Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n,* 14 F.3d 633 (D.C.Cir.1994),[14] the court pointed out:

"We think the Lucky Tab II is quite different from the machine at issue in *Cabazon.* To begin with, the Lucky Tab II is not a 'computerized version' of pull-tabs. Although the Lucky Tab II has a video screen, the screen merely displays the contents of a paper pull-tab. Instead of using a computer to select patterns, the Lucky Tab II actually cuts tabs from paper rolls and dispenses them to players. In other words, the game is in the paper rolls, not, as in the case of the *Cabazon* machine, in a computer. Indeed, players using the Lucky Tab II often play a deal simultaneously with other players in the game hall who have chosen to purchase

---

**14.** In *Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n,* 14 F.3d 633 (D.C.Cir.1994), the court noted that the video pull-tabs machine at issue "randomly selects a card for the gambler, pulls the tab at the gambler's direction, and displays the result on the screen. The computer version, like the player version, has a fixed number of winning cards in each deal." *Id.* at 635. The court held that the game played on such a machine was a "computerized version" of pull tabs and thus a Class III facsimile. *Id.*

pull-tabs from clerks. For players using the Lucky Tab II, the machine functions as an aid—it 'helps or support,' or 'assists' the paper game of pull-tabs. Webster's Third New International Dictionary 44 (1993). Without the paper rolls, the machine has no gaming function at all. It is, in essence, little more than a high-tech dealer. Viewed this way, the game played with the Lucky Tab II is not a facsimile of paper pull-tabs, it is paper pull-tabs.

"Another difference between the Lucky Tab II and the video machine at issue in *Cabazon* reinforces our belief that the Lucky Tab II should be classified as a Class II aid. The *Cabazon* machine plays the game of pull-tabs in its entirety, dispensing receipts for players to redeem winnings. By contrast, the Lucky Tab II dispenses actual paper pull-tabs that players must peel and display to a clerk before they can obtain prizes. Although the machine's scanner apparently commits few errors when reading paper pull-tabs, the fact remains that unlike the *Cabazon* machine, the Lucky Tab II is technically not final. It is, in other words, an aid to the game of pull-tabs."

*Id.* at 369–70.

Also of interest to this case is the court's rejection of the distinction that the Government sought to draw between an electronic scanner, "Tab Force Validation System," classified by the National Indian Gaming Commission as a Class II gaming aid and found by the State, in an opinion of the Attorney General, not to be a slot machine, and the Lucky Tab II machine. Noting that with the "Tab Force Validation System," "after a clerk dispenses a paper pull-tab, instead of pealing off the top layer, the player inserts the pull-tab into the machine, which scans the bar code and displays the results on a video screen," *id.* at 370, the court stated:

"We see no principled difference between the Tab Force and the Lucky Tab II. Both devices electronically 'read' paper pull-tabs and display their contents on a screen, and neither can 'change the outcome of the game.' Unlike the machine in *Cabazon,* neither contains an interior computer that generates the game. Rather, both machines facilitate

the playing of paper pull-tabs. They are thus Class II aids."

*Id.* at 370.

This comparison applies equally well to the relationship between the Play and Win machine, which the trial court validated and the State has chosen not to challenge, and the Lucky Tab II. There simply is no principled basis for distinguishing the two.

 Moreover, both sides agree that there is an element of chance whether the pull-tabs are dispensed manually or dispensed by a dispensing machine, such as the Win & Play machine, or by a validation machine, such as the Tab Force Validation Unit. By agreeing that the Lucky Tab II dispenses the pull-tabs non-randomly and in sequence, they also have agreed, in effect, that the element of chance is in the pull-tabs themselves, and not in the operation of the machine. As we have seen, § 264B requires that, to be a slot machine, the element of chance must be in the operation of the device or machine. That requirement of the statute is not supplied by the player's perception. Nor does, or can, the legislative history of § 264B fill the gap, where, as here, the statutory requirements are clear and unambiguous.

JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.