979 A.2d 710

**In re GLORIA H.**

**No. 15 Sept.Term, 2008.**

Court of Appeals of Maryland.

Sept. 14, 2009.

564

Stacy W. McCormack, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore, MD), on brief, for Appellant.

Jessica V. Carter, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, Judge.

In this appeal from the Circuit Court for Prince George's County, sitting as a Juvenile Court, we hold that the State's evidence was sufficient as a matter of law to establish that Gloria H., Appellant, violated the compulsory public school attendance law set forth in § 7–301 of the Education Article. We also hold, however, that Appellant is entitled to a new trial on the issue of whether she was "involved" in a violation of that statute.

## Background

§ 3–8A–03 of the Courts and Judicial Proceedings Article, in pertinent part, provides:

> *(c) Criminal cases under compulsory public school attendance laws.*—The jurisdiction of the [Juvenile] court is concurrent with that of the District Court in any criminal

case arising under the compulsory public school attendance laws of this State.

At all times relevant to the case at bar, § 7–301 of the Education Article,[1] in pertinent part, provided:

Compulsory attendance.

(a) Who must attend.—(1) Except as otherwise provided in this section, each child who resides in this State and is 5 years old or older and under 16 shall attend a public school regularly during the entire school year unless the child is otherwise receiving regular, thorough instruction during the school year in the studies usually taught in the public schools to children of the same age.

---

1. Effective June 30, 2009, this statute, in pertinent part, provides:
   (a) Who must attend.—
   (1) Except as otherwise provided in this section, each child who resides in this State and is 5 years old or older and under 16 shall attend a public school regularly during the entire school year unless the child is otherwise receiving regular, thorough instruction during the school year in the studies usually taught in the public schools to children of the same age.
   * * *
   (c) Duty of parent or guardian.—Each person who has legal custody or care and control of a child who is 5 years old or older and under 16 shall see that the child attends school or receives instruction as required by this section.
   * * *
   (e) Penalties.—
   * * *
   (2) Any person who has legal custody or care and control of a child who is 5 years old or older and under 16 who fails to see that the child attends school or receives instruction under this section is guilty of a misdemeanor and:
   (i) For a first conviction is subject to a fine not to exceed $ 50 per day of unlawful absence or imprisonment not to exceed 10 days, or both; and
   (ii) For a second or subsequent conviction is subject to a fine not to exceed $ 100 per day of unlawful absence or imprisonment not to exceed 30 days, or both.
   (3) As to any sentence imposed under this section, the court may suspend the fine or the prison sentence and establish terms and conditions which would promote the child's attendance. The suspension authority provided for in this subsection is in addition to and not in limitation of the suspension authority under § 6–221 of the Criminal Procedure Article.

\* \* \*

(c) Duty of parent or guardian.—Each person who has legal custody or care and control of a child who is 5 years old or older and under 16 shall see that the child attends school or receives instruction as required by this section.

\* \* \*

(e) Penalties—. . . .

(2) Any person who has legal custody or care and control of a child who is 5 years old or older and under 16 who fails to see that the child attends school or receives instruction under this section is guilty of a misdemeanor and;

(i) For a first conviction is subject to a fine not to exceed $50 per day of unlawful absence or imprisonment not to exceed 10 days, or both; and

(ii) For a second or subsequent conviction is subject to a fine not to exceed $100 per day of unlawful absence or imprisonment not to exceed 30 days, or both.

(3) As to any sentence imposed under this section, the court may suspend the fine or the prison sentence and establish terms and conditions which would promote the child's attendance. The suspension authority provided for in this subsection is in addition to and not in limitation of the suspension authority under § 6–221 of the Criminal Procedure Article.

Appellant was charged in an Adult Truancy Petition ("Juvenile Petition–Adult") that included the following assertions:

1. That the [Appellant] was born on 09–AUG–1966 and is an adult residing [in] Prince George's County, MD 20743.

2. That your Petitioner alleges that the [Appellant] did:

\* \* \*

c. on <u>or about August 22, 2005</u> have control over [her daughter, Monica[2]], a child who was five (5) years or older and under sixteen (16) years of age and who is

---

**2.** In the Petition, Appellant's daughter is identified as "Ronnika K." We shall refer to the child as "Monica," to be consistent with how her name appears in the adjudicatory hearing transcript.

subject to the compulsory attendance laws of the State as defined in Section 7–301 of the Education Article of the Annotated Code of Maryland, and failed to see that the child attended school or received instruction;

3. That such conduct constitutes a violation of Section 7–301 thereby constituting a criminal misdemeanor[.]

\* \* \*

WHEREFORE, the State asks that the Court make appropriate findings and dispositions[.]

During the adjudicatory hearing on this Petition, the State presented its case through the testimony of Jacqueline Nayes, a Pupil Personnel Worker employed by the Prince George's County Public School System. According to Ms. Nayes, (1) Monica, a student at Suitland High School, had been absent on seventy four of the one hundred eighty days in the Prince George's County Public School System's 2005–2006 school year,[3] and (2) from October of 2005 to the end of the school year, she contacted Appellant about Monica's attendance record "at least five times." The following transpired during Ms. Nayes' direct examination:

THE PROSECUTOR: Now, Ms. Nayes, when you would have a conversation with [Appellant], what if anything would she tell you about this child? What reasons did she give you for the child's (unintelligible)?

MS. NAYES: She just said that Monica—at the inner-agency council she said she was trying to get Monica to school. And she was trying and the grandmother—I've spoken to the grandmother. She has tried too.

THE PROSECUTOR: In what way have they tried or did she indicate[ ] in what way she had tried?

MS. NAYES: I think on some occasions, and I don't think it was on a regular basis, but I think she does—she has brought her to school. Drive her to school.

---

3. According to the school system's records, Monica had been suspended for seven of the seventy four days on which she was marked absent.

The following transpired during Ms. Nayes' cross-examination:

[APPELLANT'S COUNSEL]: If you are physically in the building but don't go to class[,] specifically home-room, you're marked absent?

MS. NAYES: You are marked absent. However, if a teacher spots you then ... they're supposed to alert the attendance office to let them know.

\* \* \*

[APPELLANT'S COUNSEL]: And once she enters the school building she's—once she enters the school building she's then in the care and custody of the Suitland High School?

MS. NAYES: Correct.

Appellant and Monica both testified that, although Monica arrived at her *school* on a regular basis, Monica rarely attended the classes to which she was assigned.

The following transpired during Appellant's cross-examination:

[THE PROSECUTOR]: At some point you realized that your child was not going to school?

[APPELLANT]: Yes.

[THE PROSECUTOR]: And what if anything did you do when you found out she was not in school?

[APPELLANT]: I would leave work and take her to school or get the cab to take her.

[THE PROSECUTOR]: So the only thing you did was (unintelligible) send her to school (unintelligible)?

[APPELLANT]: Correct.

[THE PROSECUTOR]: But there were sometimes when you did not even see her get on the bus, right?

[APPELLANT]: Right.

[THE PROSECUTOR]: Now how much did you pay a cab to take her to school?

[APPELLANT]: Ten dollars.

\* \* \*

[THE PROSECUTOR]: Of the 74 days is it your testimony then that she was in school but not in class for those 74 days?

[APPELLANT]: Yes.

[THE PROSECUTOR]: How do you know?

[APPELLANT]: 'Cause she wasn't at home when I got there.

[THE PROSECUTOR]: For those 74 days—for the 74 days?

[APPELLANT]: Uh-huh.

\* \* \*

[THE PROSECUTOR]: Okay. Did you ever ask Monica why she didn't want to go to school?

[APPELLANT]: No.

[THE PROSECUTOR]: (Unintelligible)?

[APPELLANT]: I mean, she tells me she goes to school, she just don't go to class.

[THE PROSECUTOR]: Okay. Did you ever find out why you[r] child didn't like to go to class?

[APPELLANT'S COUNSEL]: Objection, the issue is whether or not she went to school.

[THE PROSECUTOR]: well it—

THE COURT: Overruled.

[THE PROSECUTOR]:—even in school or—

THE COURT: All right. I said—I said overruled.

[APPELLANT]: Can you repeat the question, please?

THE COURT: Did you ever ask her why she didn't want to go to class?

[APPELLANT]: No.

[THE PROSECUTOR]: You never did?

THE COURT: The answer is no. Next question.

[THE PROSECUTOR]: Nothing further.

The following transpired during Monica's cross-examination:

['THE PROSECUTOR]: Did there come a point in time when you got disciplined for not going to class?

WITNESS: Yes.

[THE PROSECUTOR]: What kind of discipline was that?

WITNESS: I couldn't go outside or nothing.

[THE PROSECUTOR]: You couldn't go outside?

WITNESS: Yes.

[THE PROSECUTOR]: Okay. And that was it?

WITNESS: Yes.

[THE PROSECUTOR]: Okay. And how long would you be—I guess you would call that—you were grounded, is that it?

WITNESS: Yes.

[THE PROSECUTOR]: How long would you be grounded?

WITNESS: I don't know.

\* \* \*

[THE PROSECUTOR]: How long would your mom ground you?

WITNESS: I don't know.

[THE PROSECUTOR]: You can't remember?

WITNESS: No.

[THE PROSECUTOR]: Days, weeks, months?

(No verbal response.)

[THE PROSECUTOR]: So you'd be grounded, but you still wouldn't go to school?

WITNESS: Yes.

[THE PROSECUTOR]: And you'd be in the school building according to you, but you wouldn't go to class?

WITNESS: Yes.

[THE PROSECUTOR]:—for 74 days? And where were you hanging out?

WITNESS: In the hallways.

[THE PROSECUTOR]: Just hanging out in the hallways?

(No verbal response.)

[THE PROSECUTOR]: Who were you hanging out with?

[APPELLANT'S COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

WITNESS: Sometimes with my friends or by myself.

[THE PROSECUTOR]: When you were hanging out by yourself—so the times you hung out by yourself, according to you, your friends would be in class, right?

WITNESS: I don't know.

[THE PROSECUTOR]: But they wouldn't be with you, hanging out in the hallways, right?

WITNESS: Yes.

[THE PROSECUTOR]: You'd be hanging out by yourself?

WITNESS: Yes.

\* \* \*

[THE PROSECUTOR]: So when you go to school and you hang out in the hallways, what time would you get home?

WITNESS: My regular time.

[THE PROSECUTOR]: What did you say?

WITNESS: My regular time.

[THE PROSECUTOR]: Which was? Which is what?

WITNESS: Three—

[THE PROSECUTOR]: Three o'clock. Okay.

WITNESS: Yes.

[THE PROSECUTOR]: When you get home, would your mom be home?

WITNESS: Yes.

THE COURT: I can't hear you. What did you say?

WITNESS: Yes.

[THE PROSECUTOR]: Okay. And what would you tell her?

WITNESS: Nothing.

[THE PROSECUTOR]: Nothing? What would she ask you?

WITNESS: Sometimes she'd ask me do I go to class, sometimes she don't.

[THE PROSECUTOR]: What would you tell her?

WITNESS: No or yes—I'd say yes, sometimes I said no.

[THE PROSECUTOR]: Okay. Sometimes you tell her you didn't go to class, right?

WITNESS: Yeah.

[THE PROSECUTOR]: Okay. And the only thing that she did was ground you?

WITNESS: Yes.

The summation of Appellant's counsel included the following arguments:

[APPELLANT'S COUNSEL]: .... Your Honor, again the petition alleges that Ms. H., failed to see that her child attended school. Ms. H., testified that she got up early in the morning, because she had to be in school to work at 7:00. She got her daughter up. Her daughter left the house with her. She paid for a cab for her daughter to go to school after they determined it wasn't safe after a robbery at the school bus stop with her tote. She drove her to school sometimes herself. Her daughter said—Monica also testified that some days she also got a ride from her aunt. Ms. H., never let her daughter just stay home from school. When Ms., H., received phone calls from the school that her daughter wasn't in class, she did leave work to go check—a—at home to make sure she was not there and then reported to the school. Your Honor, once she gets her daughter to school, which is her responsibility, she's not— she's in the care and custody of the school. She has to go to work. She's not going to sit in school all day and follow her around. The statute says that she has to see that her daughter attends school and she did that. She did not fail to see that her child attended school. She got her there. Her daughter just decided that she wasn't going to go to class and she got up there and she testified to that. I don't

think that should be attributed to Ms. H., Your Honor and I would ask that she be found not involved.

The prosecutor responded with the following arguments:

[THE PROSECUTOR]: Your Honor, the—again this case boils down to credibility, and this is just very sad, and very pathetic. One of the reasons being the apathy, with which the [Appellant] testified. Counsel—the apathy that was evident on the part of the child, Monica S. According to this [Appellant] she did everything she could, yet she admitted that she never once asked her daughter why don't you want to go to school. The statute clearly states that she has a responsibility to ensure that that child attends school or obtains some sort of instruction. She testified that she would get a cab, but she didn't always see the child get into the cab. There were times she would go up to the school, and the child would be there, but would not be in class, but that was not all the time. I—I—Your Honor, of those 74 days, it boils down to credibility. There's no way that she could say for sure that for those 74 days that child was in the school building or had even made it to school if she didn't see her get into the cab. I think that [Appellant] clearly, yes, she may have made an attempt by calling a cab and paying $10.00 per day, but she did not do everything she could to ensure that her child received the education that she needed to receive. All she did was to ground her. We don't know whether it was for hours, days, weeks or months. But all that child got was or all that happened was that she was told she couldn't go outside when she was missing so many days of school. And her mother knew from Ms. Nayes that there was a problem. I think she could have done more and I ask that you find her involved.

At that point, the Circuit Court announced the following findings and conclusions:

THE COURT: I guess your case is a lot—it is a lot different—a lot like a lot of other cases coming here in these kinds of cases especially the testimony that's been present-ed here. And that is, whether or not I believe the testimo-

ny that's been presented to me. The [S]tate's witnesses testified basically regarding the records that are contained and the number of days that you've missed. And your lawyer is right to an extent. Seventy-four days have been missed in the 2005–2006 school year. Quite frankly only to 76—seven of those may be directly attributable to—attributable to you not sending the child to school and the child not attending school properly or being unexcused absences have—in fact those seven may have been excused because the child was suspended. But what is probably shocking and telling in this case, one of the last questions the [S]tate's attorney asked you. Did you ever talk to your child about why she wasn't going to school? To me that's a bit incomprehensible that the answer would be no. When the child was withdrawn in February because the child had missed 44 days by February 24, 2006 and you never talked to her. She goes to live with the father purportedly to try to get her on the right t[r]ack to go to school. She comes back or re-enrolled somewhere around February—strike that, March 17, then she misses another 26 to the end of the school year in June. You never talked to her to find out—ask her why and she's not going. And she was suspended, as you say, for cutting classes. You never—after she's suspended you don't ask, baby why you being suspended, and you know you're suspended for cutting classes, what is your reason for cutting classes? I would have to say something is wrong. Either you talked to her or you knew that she wasn't going and you weren't encouraging her to going—to go to school and—or that she missed the six or seven days from school and you knew she missed the six or seven days from school and you didn't encourage her to go to school. So it is one of two. Did you talk to her and if you talked to her and you just encouraged her, or you just didn't give a durn that she wasn't going to school? And it appears as though you just didn't give a durn. That's what it appears as though. That's the—and the hard cold reality of it all right now, I don't think it has registered on you or your daughter until today … I'm concluding that she

wasn't going to school because it is just hard for me to imagine someone is paying $10.00 a day basically every day to catch a taxi to school and you're going to ask—you see the report card, you know she's been suspended. You know by February she's already missed 44 days and you're not going to ask. When you put all those pieces together, I'm going to—I can't help but conclude that the child was not attending school and the mother knew that she was not attending school and she was not encouraging her to attend school. And the court will find that the [S]tate has proven its case. The court will, in fact, find the [Appellant] involved of the one count of this petition.

The Circuit Court placed Appellant on unsupervised probation, Appellant noted an appeal of that disposition to the Court of Special Appeals, and filed a brief in which she presented a single argument:

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUSTAIN THE TRIAL COURT'S FINDING THAT THE APPELLANT VIOLATED MD. CODE, EDUCATION, § 7–301(E)(2).

Before this argument was presented to a panel of the Court of Special Appeals,[4] this Court issued a writ of certiorari on its own initiative. 404 Md. 658, 948 A.2d 70 (2008).

## Discussion

### I.

■ Appellant argues (in the words of her brief):

Notwithstanding the appellant's efforts, the trial court found that there was sufficient evidence to sustain a finding that the appellant "failed to see that her child attended school." Such a finding is simply not supported by evi-

---

4. Because no prior appellate decision has been rendered in the case at bar, the designation of the parties is controlled by Md. Rule 8–111(a)(1).

dence. The appellant did everything she could to see that Monica attended school. As such, reversal is required.

■ This argument incorrectly assumes that the Circuit Court was required to accept the testimony presented by Appellant and Monica. The Circuit Court was entitled to (1) accept—or reject—*all, part,* or *none* of the testimony of any witness, including testimony that was not contradicted by any other witness, and (2) draw reasonable inferences from the facts that it found to be true. "There is nothing mysterious about the use of inferences in the fact-finding process. Jurors routinely apply their common sense, powers of logic, and accumulated experiences in life to arrive at conclusions from demonstrated sets of facts." *Robinson v. State,* 315 Md. 309, 318, 554 A.2d 395, 399 (1989). In bench trials, judges do the very same thing.

In *Attorney Grievance Comm'n v. Clements,* 319 Md. 289, 572 A.2d 174 (1990), while ordering that a Petition for Disciplinary Action be dismissed, this Court stated:

> [The Hearing Court] plainly rejected Clements's testimony[.] Thus, we eliminate from our analysis that aspect of Clements's defense. . . . The issue is whether Bar Counsel presented sufficient evidence of the charge to meet the clear and convincing standard of proof.

*Id.* at 298, 572 A.2d at 179. Because the Circuit Court was entitled to reject all of Appellant's evidence, to determine whether the State presented sufficient evidence to meet the beyond a reasonable doubt standard of proof, we are required to "eliminate" Appellant's evidence from our analysis. Having done so, we must determine whether evidence that a high school student was not in his or her home-room when attendance was taken is sufficient to support the inference that the student did not attend school on that day. We conclude that, from evidence of the days that Monica was not in her home-room on the days that she was marked absent, a reasonable trier of fact could reasonably find beyond a reasonable doubt that, for more than ten weeks of the 2005–2006 school year (1) Monica did not attend school, and (2) Appellant had failed to

see that Monica attended school during that period of time.[5]

Having concluded that the evidence presented by the State was sufficient as a matter of law to establish that Appellant failed to see that Monica attended school, we must then determine whether the verdict announced by the Circuit Court was based upon a clearly erroneous factual finding and/or a mistaken conclusion of law. In making this determination, we presume that the Circuit Court knows the applicable law and applied that law correctly. This presumption is *rebuttable,* however, and may be rebutted in several ways. For example,[6] in *Thornton v. State,* 397 Md. 704, 919 A.2d 678 (2007), while holding that the State's evidence was sufficient as a matter of law to prove that the Appellant had committed a second degree murder, this Court also held that, "the trial judge's mistaken conclusions of law, which modified the specific intent requirement and unconstitutionally shifted the burden of proof to Thornton, warrants our reversal of Thornton's conviction for murder in the second degree and a remand of the case for a new trial." *Id.* at 742, 919 A.2d at 700.

This presumption was rebutted in the case at bar when the Circuit Court based its verdict upon an impermissible inference. In *VF Corp. v. Wrexham Aviation,* 350 Md. 693, 715 A.2d 188 (1998), this Court stated that, "[t]he jury's prerogative not to believe certain testimony ... does not constitute affirmative evidence to the contrary." *Id.* at 711, 715 A.2d at 196. In *Clements, supra,* this Court stated:

---

**5.** According to the dissenting opinion, "[a]ll of the evidence supports the conclusion that Gloria H .... did see that Monica ... was *at* school." The Circuit Court, however, was entitled to reject all of Appellant's evidence. Because the Circuit Court did so, this Court must "eliminate" Appellant's evidence when deciding the "sufficiency" issue.

**6.** *Thornton* is merely one *example* of what occurs when an appellate court holds that, although the State's evidence was sufficient as a matter of law, the verdict must be set aside on other grounds. Other examples include *Diggs v. State,* 409 Md. 260, 973 A.2d 796 (2009); *State v. Grady,* 276 Md. 178, 345 A.2d 436 (1975) (*aff'g Grady v. State,* 24 Md.App. 85, 329 A.2d 726 (1974)); and *State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976) (*aff'g Evans v. State,* 28 Md.App. 640, 349 A.2d 300 (1975)).

A refusal to believe evidence of a respondent, however, does not, of itself, supply affirmative evidence of the dishonesty, fraud, deceit or misrepresentation charged.

319 Md. at 298, 572 A.2d at 179.

The record clearly shows that the Circuit Court's verdict was based in substantial part upon its finding that, because Appellant's "incomprehensible" testimony lacked credibility, the opposite of her exculpatory testimony must be true. For the reasons stated in *VF Corp., supra,* and *Clements, supra,* the Circuit Court erred in drawing this impermissible inference.[7] We therefore hold that, although Appellant was not entitled to a judgment in her favor as a matter of law, she is entitled to a new trial.

## II.

Appellant also argues that she was entitled to a verdict in her favor on a ground that is certain to be raised during the retrial. According to Appellant, while it is her obligation to "see that Monica attends *school,*" it is the school system's obligation to see that Monica attends *classes* after she has arrived at school. The record shows that Ms. Nayes agreed with the assertion that, "once [Monica] enters the school building[,] she's then in the care and custody of the Suitland High School[.]" For the reasons that follow, so do we.

Whether the legislature intended to impose criminal liability on parents whose children go to school, but do not attend classes, presents an issue of statutory interpretation. In *WCI v. Geiger,* 371 Md. 125, 807 A.2d 32 (2002), this Court stated:

Repeatedly, we have emphasized that "the paramount object of statutory construction is the ascertainment and

---

7. According to the dissenting opinion, "[t]he [impermissible] factual inference drawn by the judge was the key to the judge's finding that the evidence was sufficient." The impermissible inference, however, was actually the key to the judge's finding *beyond a reasonable doubt* that Gloria H. was *"involved."* That is why she is entitled to a new trial rather than an outright reversal.

effectuation of the real intention of the Legislature." *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 301, 783 A.2d 667, 670 (2001). *See Robinson v. State*, 353 Md. 683, 694, 728 A.2d 698, 703 (1999); *Degren v. State*, 352 Md. 400, 417, 722 A.2d 887, 895 (1999); *Wesley Chapel v. Baltimore*, 347 Md. 125, 137, 699 A.2d 434, 440 (1997); *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). In seeking to ascertain legislative intent, we first look to the words of the statute, *see Mayor and City Council of Baltimore v. Chase*, 360 Md. 121, 756 A.2d 987, 990 (2000); *Harris v. State*, 353 Md. 596, 606, 728 A.2d 180, 184 (1999); *Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998); *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (*quoting Tidewater v. Mayor of Havre de Grace*, 337 Md. 338, 344, 653 A.2d 468, 472 (1995)), viewing them "in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood." *Derry v. State*, 358 Md. 325, 335, 748 A.2d 478, 484 (2000); *see also Sacchet v. Blan*, 353 Md. 87, 92, 724 A.2d 667, 669 (1999); *Whack v. State*, 338 Md. 665, 672, 659 A.2d 1347, 1350 (1995). "Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent." *Degren*, 352 Md. at 417, 722 A.2d at 895 (*citing Marriott Employees*, 346 Md. at 444–45, 697 A.2d at 458); *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County*, 248 Md. 403, 414, 237 A.2d 35, 41 (1968). Nor may a court under those circumstances add or delete language so as to "reflect an intent not evidenced in that language," *Condon v. State*, 332 Md. 481, 491, 632 A.2d 753, 755 (1993), or construe the statute with " 'forced or subtle interpretations' that limit or extend its application." *Id.* (*quoting Tucker v. Fireman's Fund Insurance Co.*, 308 Md. 69, 73, 517 A.2d 730, 732 (1986)).

Only when the statutory language is unclear and ambiguous, will courts look to other sources, such as the legislative history. *Degren*, 352 Md. at 417, 722 A.2d at 895; *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590, 594 (1992). We neither add words to, nor delete words from, a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature chose to use, and we do not engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. *Taylor v. Nations-Bank*, 365 Md. 166, 181, 776 A.2d 645, 654 (2001); *Mid–Atlantic Power Supply Ass'n v. Public Service Comm'n*, 361 Md. 196, 204, 760 A.2d 1087, 1091 (2000). Moreover, whenever possible, the statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. *Taylor*, 365 Md. at 181, 776 A.2d at 654; *Chesapeake Amusements, Inc. v. Riddle*, 363 Md. 16, 29, 766 A.2d 1036, 1042 (2001); *Mid–Atlantic Power Supply Ass'n*, 361 Md. at 204, 760 A.2d at 1091. And a statute is to be given a reasonable interpretation, not one that is illogical or incompatible with common sense. *State v. Brantner*, 360 Md. 314, 322, 758 A.2d 84, 88–89 (2000); *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990); *Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985); *Erwin and Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 315, 498 A.2d 1188, 1194 (1985).

We have acknowledged that in determining a statute's meaning, courts may consider the context in which a statute appears, including related statutes and, even when a statute is clear, its legislative history. *See Morris v. Prince George's County*, 319 Md. 597, 604, 573 A.2d 1346, 1349 (1990); *see also Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987). We have cautioned, however, that this inquiry is "in the interest of completeness," *Harris, supra*, 331 Md. at 146, 626 A.2d at 950, "to look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." *Id.* That inquiry, in other words, we emphasized in

*Chase,* "is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute." *Chase, supra,* 360 Md. at 131, 756 A.2d at 993; *see also Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977) ("a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exception s not made by the legislature.").

*Id.* at 140–43, 807 A.2d at 41–42.

■■■ Because we are interpreting a criminal statute, if we are unable to ascertain the "real intention" of the legislature, we must "make use of an aid to statutory interpretation known as the 'rule of lenity.'" *Monoker v. State,* 321 Md. 214, 222, 582 A.2d 525, 529 (1990).

The rule of lenity was originally formulated by the United States Supreme Court as a principle of statutory construction. The policy behind the rule is " 'that the Court will not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.'" *White v. State,* 318 Md. at 744, 569 A.2d 1271, *quoting Simpson v. U.S.,* 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978), which in turn quotes *Ladner v. U.S.,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). The rule of lenity is neither absolute nor exclusive, nor are there any fixed criteria for applying it. *White v. State,* 318 Md. at 745, 569 A.2d 1271.

*Id.* at 222–23, 582 A.2d at 529.

■■■ The words of the statute do not make it clear whether the legislature intended that the compulsory public school attendance law would impose criminal liability on a parent whose child "cuts class." Applying the rule of lenity, we conclude that the statute at issue does not impose criminal liability on a parent whose child "enters the school building." A contrary conclusion would be inconsistent with *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983), in which this Court stated:

Maryland's public school system is administered pursuant to the provisions of the Education Article of the Maryland Code.... The State Board of Education ... is entrusted with the general care and supervision of the public elementary and secondary schools of the State; it is empowered to determine and carry out the State's public school policies and to adopt bylaws, rules and regulations for the administration of the system.... A county Board of Education in each county and a Board of School Commissioners in Baltimore City, together with their local school superintendents, are vested with control over educational matters in their respective school districts. Subject to applicable bylaws, rules and regulations of the State Board, the local authorities are empowered to determine the educational policies within their own school districts.

*Id.* at 603, 458 A.2d at 762.

A contrary conclusion would also be inconsistent with *Frugis v. Bracigliano,* 177 N.J. 250, 827 A.2d 1040 (2003), in which the Supreme Court of New Jersey stated:

The law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators during school hours. While their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards. No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others.

*Id.* at 1050.

■■■ Our conclusion is consistent with *Blau v. Ft. Thomas Public School District, et al.,* 401 F.3d 381 (6th Cir.2005), in which the United States Court of Appeals for the Sixth Circuit affirmed a summary judgment entered by the United States District Court for the Eastern District of Kentucky in favor of a school district that had been sued because it established a "dress code." The *Blau* Court stated:

The critical point is this: While parents may have a fundamental right to decide *whether* to send their child to a public

school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities." *Goss v. Lopez,* 419 U.S. 565, 578, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); see *Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275, 291 (5th Cir.2001) ("While parents may have a fundamental right in the upbringing and education of their children, this right does not cover the parent's objection to a public school Uniform Policy."); see also *Leebaert v. Harrington,* 332 F.3d 134, 142 (2d Cir.2003) (The fundamental right to control the upbringing and education of one's child does not include "the right to tell public schools what to teach or what not to teach him or her."); *Swanson v. Guthrie Indep. Sch. Dist.,* 135 F.3d 694, 699 (10th Cir.1998) (parents do not have a fundamental right to send their child to school part-time only and pick and choose the classes she takes); *Herndon v. Chapel Hill–Carrboro City Bd. of Educ.,* 89 F.3d 174, 176 (4th Cir.1996) (requirement that high school students perform community service in order to graduate does not violate parents' right to control education of their children); *Immediato v. Rye Neck Sch. Dist.,* 73 F.3d 454, 462 (2d Cir.1996) (applying rational-basis review to determine that high school could require community service before graduation); *Brown v. Hot, Sexy and Safer Prods., Inc.,* 68 F.3d 525, 533 (1st Cir.1995) (parents' fundamental right to control a child's education does not include the right to control curriculum at their child's public school); *Kite v. Marshall,* 661 F.2d 1027, 1029 (5th Cir.1981) (parents have no fundamental right to send their children to summer athletic camp against school regulation prohibiting such camps).

*Id.* at 395–96. (Emphasis in original).

Because a child who "attends school" is "committed to the control of state and local authorities," while evidence that a

high school student was not in his or her homeroom when attendance was taken is sufficient to establish that the student did not attend school on that day, when all of the evidence that is presented generates a genuine question of fact on the issue of whether the child was "cutting class" rather than "skipping school," a finding that the child's parent violated the compulsory school attendance law requires proof beyond a reasonable doubt that the child did not attend *school.*

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, SITTING AS A JUVENILE COURT, VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

Concurring and Dissenting Opinion by BATTAGLIA, J., which BELL, C.J., joins in the concurrence and Part I only of the dissent.

BATTAGLIA, Judge, concurring and dissenting, which BELL, C.J., joins in the concurrence and Part I only of the dissent.

I concur with the majority in the reversal of Gloria H.'s conviction, but dissent on two bases—that the evidence was sufficient to convict her and that as a matter of law the compulsory attendance statute does not impose criminal liability on a parent whose child enters the school building.

I.

"The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith,* 374 Md. 527, 533, 823 A.2d 664, 668 (2003), citing *Jackson v. Virginia,* 443 U.S. 307, 313, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821, 827 (2002); *White v. State,* 363 Md. 150, 162, 767 A.2d 855, 861–62 (2001); *State v. Albrecht,*

336 Md. 475, 478–79, 649 A.2d 336, 337–38 (1994). We view the evidence in the light most favorable to the prosecution. *Albrecht,* 336 Md. at 478, 649 A.2d at 337, citing *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573, and *Branch v. State,* 305 Md. 177, 182–83, 502 A.2d 496, 498 (1986).

Gloria H. was found in violation of Section 7–301(c) of the Education Article, Maryland Code (1978, 2006 Repl.Vol.),[1] which provides: "[e]ach person who has legal custody or care and control of a child who is 5 years old or older and under 16 shall see that the child *attends school* or receives instruction as required by this section." (Emphasis added). Here, the burden was on the State to prove that Gloria H. had legal custody or care and control of a child who is 5 years old or older and under 16 years old and failed to see that the child attended school. There is no dispute that Gloria H. had legal custody over Monica, who, at the time in dispute, was 14 years old. The only fact in dispute was whether Gloria H. failed to see that her child *attended school.*

Attempting to meet its burden, the State relied on testimonial evidence that Gloria H. was aware that Monica was at school but not in class on the 67 days that Monica, who was 14, was marked absent.[2] Jacqueline Nayes, the pupil personnel worker, testified that she contacted Appellant in person at least five times during the school year, as well as telephoned Gloria H. several times. Ms. Nayes testified she advised Gloria H. that Monica was missing school and that something needed to be done. Gloria H., while admitting that she was aware of Monica's attendance problems, testified that, as a working single mother, she did everything she could to get Monica to school and never "just let her stay home." She testified to waking Monica up, arranging for a cab to drive Monica to school after Monica reported her fears of riding the bus because of her coat being stolen, and on some days, even

---

1. Each cite to Section 7–301 of the Education Article refers to Maryland Code (1978, 2006 Repl.Vol.), unless otherwise indicated.

2. The record indicates Monica was suspended for seven of the 74 days she was absent during the 2005–06 school year.

driving Monica to school, though Gloria H. worked at a job that required her to be at work before Monica left for school. Gloria H. also testified that on some days, when the school called her to say Monica was absent, she would leave work to go to the school, but would find Monica in the building. Most telling was Monica's testimony that she went to school every day, but did not always attend her classes; rather, she would hang out "in the hallways."

While the trial judge disbelieved the totality of Gloria H.'s testimony, he did so on the basis of his sense that Gloria H. never talked to Monica about her absences, which strained his credulity:

> But what is probably shocking and telling in this case, one of the last questions the state's attorney asked you. Did you ever talk to your child about why she wasn't going to school? Did you ever talk to your child about why she wasn't going to school? To me that's a bit incomprehensible that the answer would be no. When the child was withdrawn in February because the child had missed 44 days by February 24, 2006 and you never talked to her. She goes to live with the father purportedly to try to get her on the right track to go to school. She comes back or re-enrolled somewhere around February—strike that, March 17, then she misses another 26 to the end of the school year in June. You never talked to her to find out—ask her why and she's not going. And she was suspended, as you say, for cutting classes. You never—after she's suspended you don't ask, baby why you being suspended, and you know you're suspended for cutting classes, what is your reason for cutting classes?

> I would have to say something is wrong. Either you talked to her or you knew that she wasn't going and you weren't encouraging her to going—to go to school and—or that she missed the six or seven days from school and you knew she missed the six or seven days from school and you didn't encourage her to go to school.

> So it is one of two. Did you talk to her and if you talked to her and you just encouraged her, or you just didn't give a

durn that she wasn't going to school? And it appears as though you just didn't give a durn. That's what it appears as though. That's the—and the hard cold reality of it all right now, I don't think it has registered on you or your daughter until today.

I would find this ruling to be clearly erroneous, because it interjects that the parent must "talk" to the child as an element of the crime or risk criminal culpability as a result of the judge's personal belief system.

All of the evidence supports the conclusion that Gloria H. did not violate Section 7–301(c)—she did see that Monica *attended* school—that Monica was *at* school. Gloria H. drove Monica oftentimes, insured that she paid for a cab to take her, and that she went to school when she was called and found Monica in school, although the school staff obviously did not. Monica even testified that she went to school daily.

The majority, however, determines that the evidence was sufficient, but reverses Gloria H.'s conviction, based upon the premise that "we must then determine whether the verdict announced by the Circuit Court was based upon a clearly erroneous factual finding and/or a mistaken conclusion of law." Citing *Thornton v. State*, 397 Md. 704, 919 A.2d 678 (2007), the majority opines that the case must be retried because the trial court did not believe Gloria H.'s testimony and relied on an "impermissible inference" that "the opposite of her exculpatory testimony must be true." In *Thornton*, however, we held that "the trial judge's mistaken *conclusions of law*, which modified the specific intent requirement and unconstitutionally shifted the burden of proof to Thornton, warrants our reversal of Thornton's conviction for murder in the second degree and a remand of the case for a new trial." *Id.* at 742, 919 A.2d at 700. (emphasis added).

In the second case relied on by the majority, *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 715 A.2d 188 (1998), a civil case, this Court reversed one of the judgments because of a lack of clear and convincing evidence of fraud. We explored the circumstantial evidence presented and determined that it

constituted "an extremely thin reed upon which to base any inference of fraud ... it certainly does not amount to clear and convincing evidence." *Id.* at 712, 715 A.2d at 197. Our explanation of the jury's alleged disbelief and reliance on the opposite was within a lengthy discussion of insufficience, rather than the determinative basis for reversal. We stated that, "[t]he jury's prerogative not to believe certain testimony ... does not constitute affirmative evidence of the contrary." *Id.* at 711, 715 A.2d at 196.

On the basis of both of these cases, the majority reverses and orders a new trial. If the majority were to have found the evidence insufficient to sustain Gloria H.'s conviction on the charge of violating Section 7–301, as I would do on the basis of clear error, Gloria H. could not be retried. In *Mackall v. State,* 283 Md. 100, 387 A.2d 762 (1978), we were required to apply, and did apply, the Supreme Court's ruling in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), that "the Double Jeopardy Clause [of the Fifth Amendment to the Constitution of the United States] precludes a second trial once the [federal] reviewing court has found the evidence legally insufficient" and that "the only 'just' remedy available for that court is the direction of a judgment of acquittal." *Mackall,* 283 Md. at 113–14, 387 A.2d at 769 (alterations in original), quoting *Burks,* 437 U.S. at 18, 98 S.Ct. at 2150–51, 57 L.Ed.2d at 14. The *Burks* Court recognized that the prohibition against successive trials bars "the prosecution [from] another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks,* 437 U.S. at 11, 98 S.Ct. at 2147, 57 L.Ed.2d at 9–10.

In *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), decided the same day as *Burks,* the Court granted certiorari "to decide whether a State may retry a defendant after conviction has been reversed by an appellate court on the ground that the evidence introduced at the prior trial was insufficient, as a matter of law, to sustain the jury's verdict." *Id.* at 20, 98 S.Ct. at 2152, 57 L.Ed.2d at 18. The Court, referring to its holding in *Burks* that "the Double Jeopardy Clause precludes a second trial once a reviewing court has

determined that the evidence introduced at trial was insufficient to sustain the verdict," held: "Since the constitutional prohibition against double jeopardy is fully applicable to state criminal proceedings, *Benton v. Maryland,* [395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)] we are bound to apply the standard announced in *Burks* to the case now under review." *Id.* at 24, 98 S.Ct. at 2154, 57 L.Ed.2d at 21. In the instant case, the evidence was insufficient to prove that Gloria H. violated Section 7–301. Consequently, she can not lawfully be retried on the charge.

The majority's reliance upon a trial judge's "impermissible inference," which is a ground for the judge's reaching evidentiary facts contrary to Gloria H.'s testimony, is entirely misplaced. The trial judge was drawing a *factual* inference which, in the trial judge's view, created evidence contrary to Gloria H.'s testimony. The factual inference drawn by the judge was the key to the judge's finding that the evidence was sufficient. Since the factual inference was an impermissible one, the evidence was insufficient. Accordingly, under *Burks, Greene, Mackall,* and their progeny, a new trial violates the Double Jeopardy Clause of the Fifth Amendment.

## II.

The majority goes too far also in creating a bright line rule that Section 7–301 cannot be violated by a parent whose child "enters" the school. The majority claims that because Section 7–301 is unclear, "whether the legislature intended the compulsory public school attendance law would impose criminal liability on a parent whose child 'cuts class,'" the rule of lenity, as defined in *Monoker v. State,* 321 Md. 214, 222, 582 A.2d 525, 529 (1990), should be applied, and criminal liability should not be imposed on a parent whose child "enters the school building." [3]

---

**3.** In *Monoker,* this Court defined the rule of lenity as the solution to questions of statutory interpretation:

The rule of lenity was originally formulated by the United States Supreme Court as a principle of statutory construction. The policy

The majority cites *Western Correctional Institution v. Geiger*, 371 Md. 125, 807 A.2d 32 (2002) for its recital of this Court's process of statutory interpretation, overlooking the first step in seeking legislative intent, that being, "we first look to the words of the statute." *Id.* at 141, 807 A.2d at 41. The words of Section 7–301 require that a parent "shall see that the child attends school." "Attend," is defined as "to be present at: go to." Merriam–Webster Collegiate Dictionary 79 (11th ed. 2005). The majority's statutory line-drawing ignores the many circumstances in which culpability could be appropriate, and forecloses all parental liability under the statute, as soon as the child crosses the threshold of the schoolhouse doors, but does not attend classes. Although the prosecution in the instant case failed to establish that Gloria H. was liable under the statute, what could be proven in a particular case is that the child hides in the school so that the child will not be seen by school personnel, and the parent knowingly dumps the child at the school as a babysitting opportunity; or the parent encourages the child to skip classes—situations that could result in culpability under Section 7–301.

The majority, in absolving the parent from any criminal culpability, also imposes a per se responsibility on the school to ensure that a student attends class once the school's threshold is crossed, citing *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 458 A.2d 758 (1983), *Frugis v. Bracigliano*, 177 N.J. 250, 827 A.2d 1040 (2003), and *Blau v. Fort Thomas Public School District, et al.*, 401 F.3d 381 (6th

---

behind the rule is " 'that the Court will not interpret a ... criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.' " *White v. State*, 318 Md. at 744, 569 A.2d 1271, quoting *Simpson v. U.S.*, 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978), which in turn quotes *Ladner v. U.S.*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). The rule of lenity is neither absolute nor exclusive, nor are there any fixed criteria for applying it. *White v. State*, 318 Md. at 745, 569 A.2d 1271.

*Id.* at 222–23, 582 A.2d at 529 (alterations in original).

Cir.2005). None of these cases, in any way, supports the imposition of that liability on the school system. In *Hornbeck*, this Court reviewed the constitutionality of the State's public school financing system rather than statutory arguments or the liability of the school board. In *Frugis*, the New Jersey Supreme Court reviewed whether the trial court properly directed a liability verdict in favor of parents on their negligence and negligent supervision claims against a school board for the actions of one of its male principals, who took naked, pornographic photographs of male students in his office. The majority invokes the *Frugis* court's statement that the "law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators during school hours," *Frugis*, 827 A.2d at 1050, in order to totally excuse parents from any liability, once a child crosses the threshold of the school. One wonders what would have happened in *Frugis* had the school board been able to show that the parent was complicit in the photography session.

The majority cites *Blau* to support its holding that the artificial designation of the structure of the schoolhouse door obviates any proof of parental culpability. In *Blau*, the Sixth Circuit Court of Appeals reviewed whether a public school dress code interfered with a parent's right to direct the education of his child. The court stated that, "[w]hile parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. . . . [I]ssues of public education are generally committed to the control of state and local authorities." *Blau*, 401 F.3d at 395–96 (internal quotations omitted) (emphasis in original). Relying on *Blau*, the majority thereby declares that Gloria H. cannot face criminal liability because the school is in control of the child, as soon as her daughter enters the building. Certainly, as *Blau* points out, a school has control over various aspects of the child's educational experience, but control does not enable a parent to escape liability if she is a participant in a child's failure to attend class.

The majority's notion that a parent cannot face liability once the child enters the schoolhouse also obviates any tort liability of the parent for acts of the child while on the premises. In *In re Sorrell*, 20 Md.App. 179, 315 A.2d 110 (1974), a teenager's parents were held vicariously liable for property damage and medical expenses stemming from personal injuries caused by the wilful misconduct of their child. The court noted that, "in all fairness, it is better that the parents of these young tortfeasors be required to compensate those who are damaged, *even though the parents be without fault*, rather than to let the loss fall upon the innocent victims." *Id.* at 186, 315 A.2d at 114, quoting *Kelly v. Williams*, 346 S.W.2d 434, 437 (Tex.Civ.App.1961) (emphasis added) (internal quotations removed).[4] Would a parent be able to escape culpability if she gave a knife to the child to carry into the school and the child used it to harm another?

The majority's insistence on the threshold as determinative also supports the notion that the school acts as a protector of the child, which, at least federally, is questionable. The United States Court of Appeals for the Seventh Circuit in *J.O. v. Alton Community Unit School District 11*, 909 F.2d 267, 272–73 (7th Cir.1990), along with a majority of other federal courts,[5] held that school officials do not owe a constitutional

---

**4.** The *Sorrell* court held that the remedy of parental restitution fulfilled the state's legitimate interest in protecting and promoting the general welfare and was not arbitrary, oppressive, or unreasonable. *In re Sorrell*, 20 Md.App. 179, 189, 315 A.2d 110, 116. Although restitution was found to be constitutional, restitution was not ordered in *Sorrell* because the parents' were not afforded due process; the case was remanded for further proceedings. *Id.* at 190–92, 315 A.2d at 116–17. *See also In Re: John H.*, 49 Md.App. 595, 598, 433 A.2d 1239, 1240 (1981) (upholding *Sorrell's* conclusion that parental restitution was appropriate when a child was adjudicated delinquent because of acts of vandalism against several Baltimore County public schools).

**5.** "The Seventh Circuit's position that school officials owe no constitutional duty to protect students plainly is the majority view in the federal courts." *Wilson ex rel. Adams v. Cahokia School District #187*, 470 F.Supp.2d 897, 902–03 (S.D.Ill.2007), citing *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir.1997); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir.1997); *Doe v. Claiborne County*, 103

duty to protect students. The court noted that the due process clause is not a guarantee of certain minimal levels of safety, and that because schoolchildren were not as helpless as those in prisons or mental hospitals, the school did not have an affirmative duty to protect the children. The court concluded that because "parents still retain primary responsibility for . . . caring for the child," compulsory school attendance does not mean the State had assumed responsibility for the child's entire personal life. "[T]hese children and their parents retain substantial freedom to act." *J.O.,* 909 F.2d at 272.

The majority's bright-line rule creates an imaginary, arbitrary threshold of the schoolhouse door to define liability when there is no need or circumstance to do so. In so doing, the majority determines evidentiary sufficiency, impermissible inference, and then the threshold rule to permit Gloria to be retried but not convicted. The case involves evidentiary insufficiency, and Gloria H. should not be retried.

Chief Judge BELL has authorized me to state that he joins in the concurrence and Part I only of the dissent.

F.3d 495, 510 (6th Cir.1996); *Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 732 (8th Cir.1993); *Maldonado v. Josey,* 975 F.2d 727, 731–33 (10th Cir.1992); *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1372 (3d Cir.1992); *Plumeau v. Yamhill County Sch. Dist.,* 907 F.Supp. 1423, 1442–43 (D.Or.1995); *Doe v. Douglas County Sch. Dist. RE–1,* 770 F.Supp. 591, 593 (D.Colo.1991).